CITY OF SAGINAW *v.* CONSUMERS' POWER CO.

CONSUMERS' POWER CO. *v.* SAGINAW CIRCUIT JUDGES.

1. MUNICIPAL CORPORATIONS—ORDINANCES—AMENDMENT.
   An ordinance may not be repealed or amended without action of equal dignity to that required in its enactment.

2. ELECTRICITY — ORDINANCES — CONTRACT AS TO RATES — FIXED TERM—MUNICIPAL CORPORATIONS.
   Where an ordinance giving a power company the right to use the streets of a city also gave it the right, subject to certain restrictions, to fix from time to time rates for commercial light and power, said right is a property right and it requires no amendment of the ordinance to permit it to fix rates for an agreed period or term or to make a binding contract with the city that it would exercise such right in a certain way.

3. SAME—CONTRACT AS TO RATES NOT AN AMENDMENT OF ORDINANCE.
   No amendment of the ordinance being required to permit

the company to exercise its right to make contracts in regard to rates for light and power, its contract with the city to exercise said right in a certain way would not constitute an amendment thereto.

4. SAME — CONTRACTS — RATES — CONSIDERATION — MUNICIPAL CORPORATIONS.

An offer of a lighting company that if the city would accept its bid for street lighting and enter into a contract therefor, it would put into effect a certain schedule of rates for residential and commercial lighting, heating, and power, and its acceptance by the city constituted a contract between the parties, the consideration for which was the street lighting contract.

5. SAME—CONTRACTS—TERM CONTRACT—RENEWED IN ABSENCE OF NOTICE TO TERMINATE.

Where the power company agreed with the city to maintain certain commercial lighting, heating, and power rates during the term of its contract with the city for street lighting, said contract to continue for five years, and to continue for an additional period of five years unless the city should terminate it by written notice to that effect, said contract automatically continued, in the absence of said notice, for said additional period of five years, and was binding upon the parties.

6. SAME—MUNICIPAL CORPORATIONS—STREET LIGHTING CONTRACT— LENGTH OF TERM—ULTRA VIRES—STATUTES.

Said contract was not *ultra vires* and void because in violation of 1 Comp. Laws 1915, § 3427, providing that all contracts for street lighting should be for a period of not less than 3 nor more than 10 years, since the period of operation contracted for was only 10 years, and the 7 months, antedating the beginning of the contract, allowed for installing the equipment, was only a reasonable time.

7. SAME—STREET LIGHTING CONTRACT—RATES FOR BENEFIT OF INHABITANTS.

The provisions of said statute relate to contracts for public lighting and are not applicable to restrict the power of municipalities to contract for the benefit of its inhabitants.

8. SAME—TERM CONTRACT—REASONABLE LENGTH OF TIME FOR PRIVATE RATES.

Since, in the absence of statutory restrictions, municipalities

may contract for the benefit of its inhabitants for a reasonable time, it cannot be said that a contract providing the rates to be paid for commercial lighting, heating, and power for a period of 10 years and 7 months is so unreasonable, as a matter of law, as to render it void.

9. SAME—EQUITY—ESTOPPED TO PLEAD OWN WRONG IN SECURING CONTRACT.

A power company is estopped to plead its own wrong, or that of its predecessor, if it be a wrong, in offering to reduce the rates on light and power to the inhabitants of a city as an inducement to defeat at the polls a proposition to establish a municipal plant and to secure a public street lighting contract, after it had had the benefit for over half of the term, to defeat the executory portion of said contract.

10. MUNICIPAL CORPORATIONS—POWER TO CONTRACT—VALIDITY OF CONTRACT—DIRECTORY PROVISIONS OF CHARTER.

Where the power to execute a contract exists in a municipality, the contract is *intra vires*, and there is no mandatory charter, statutory, or constitutional provision offended in the execution of the same, the municipality is bound, although the corporate power is not exercised with the strict formalities provided in the charter or statutory provision that is directory only.

11. SAME—SAGINAW CHARTER—PROVISION FOR COMPETITIVE BIDS MANDATORY.

The provision of the charter of the city of Saginaw that "no contract for the expenditure by the city of a sum exceeding $250 for any purpose whatsoever shall be entered into unless the same shall be let upon competitive bids," is mandatory and not directory merely.

12. SAME — ELECTRICITY — CONTRACTS — VALIDITY — MUTUALITY —SAGINAW CHARTER—COMPETITIVE BIDS.

A contract for public lighting and power other than street lighting, entered into by the city of Saginaw with a power company without obtaining competitive bids, in violation of its charter, is lacking in mutuality, not being binding upon the city, and is therefore unenforceable by the city in a suit for specific performance.

13. CORPORATIONS—PUBLIC SERVICE CORPORATIONS—DUTY TO FURNISH SERVICE—VALIDITY OF CONTRACT.

A public service corporation is bound, from the very nature

of its business, to furnish such public service in such quantities as the public may require, and when called upon by the public for such service it cannot interpose as a defense that the contract under which it is furnishing such service lacks mutuality because a definite amount thereof is not agreed upon.

14. EQUITY—SPECIFIC PERFORMANCE—PARTIAL RELIEF.

Because the city is not entitled to all the relief it asks in its bill for specific performance it does not follow that it is not entitled to any, and, upon a motion to dismiss, the bill should be sustained if any ground for equitable relief is stated, even though imperfectly.

15. MUNICIPAL CORPORATIONS — ELECTRICITY — CONTRACTS — EQUITY—SPECIFIC PERFORMANCE FOR BENEFIT OF INHABITANTS.

Although the city could not maintain its bill for specific enforcement of its contract for light and power on its own part, because of lack of mutuality, it could enforce same so far as it related to rates to be paid by its inhabitants during the life of the contract.

16. SAME—ENTITLED TO MAINTAIN SUIT FOR BENEFIT OF INHABITANTS—MULTIPLICITY OF SUITS.

The city, as representative of its inhabitants, could maintain said bill in their behalf and thus avoid a multiplicity of suits.

17. ELECTRICITY—COURTS—JURISDICTION — PUBLIC UTILITIES COMMISSION—STATUTES.

The courts are not deprived of jurisdiction in the instant case by reason of the creation of the public utilities commission (Act No. 419, Pub. Acts 1919), there being no question of adequate service involved, and the commission not having acquired jurisdiction of the matter.

18. EQUITY—PLEADING—PRIMA FACIE CASE—DISMISSAL.

Where the bill makes a case of apparent authority, it should not be dismissed because of the claim of the company that the person making the offer to the city on its behalf was not authorized to do so.

Appeal from Saginaw; Snow (Ernest A.) and Browne (Clarence M.), JJ. Submitted February 2, 1921. (Docket No. 133.) Decided March 30, 1921.

Bill by the city of Saginaw against the Consumers' Power Company for the specific performance of a franchise contract. From an order denying a motion to dismiss, defendant appeals. Affirmed.

Mandamus by the Consumers' Power Company to compel Ernest A. Snow and Clarence M. Browne, circuit judges of Saginaw county, to set aside an order granting a temporary injunction. Submitted February 2, 1921. (Calendar No. 29,538.) Writ granted for modification of the order March 30, 1921.

*Bird J. Vincent* (*Frank A. Rockwith,* of counsel), for plaintiff.

*Weadock & Weadock* (*John F. O'Keefe,* of counsel), for defendant.

FELLOWS, J. On November 30, 1908, the common council of the city of Saginaw passed an ordinance granting to the Eastern Michigan Power Company the use of its streets for the stringing of its wires, erection of poles, etc., for a period of 30 years. Section 6 of said ordinance provided:

"The said grantee shall be entitled to charge the inhabitants of the said city for electric current for light, heat and power not more than the following prices, viz. (then follows a schedule of rates for commercial light and power not important to detail):

"The grantee shall have the right, from time to time, and within the limit of prices above mentioned, to fix, readjust and regulate its prices for any and all service rendered.

"At the end of ten years from the date of the passage of this ordinance, and at the end of every ten years thereafter during the time this ordinance shall remain in force, the prices of electric current for light, heat and power, to the inhabitants of the city of Saginaw, shall be fixed for the ensuing ten years at the re-

quest of the common council of this city, by five disinterested persons, two of whom shall be appointed by the common council, two by the grantee herein, and these four persons shall select a fifth, and said five persons, or a majority of them, shall fix the prices to be paid aforesaid for the ensuing ten-year period, and the prices so fixed shall be just and reasonable and not in excess of the rates hereinbefore designated, and the rates so fixed shall be final."

The Eastern Michigan Power Company accepted this franchise ordinance. The Saginaw Power Company succeeded to the rights and liabilities of the Eastern Michigan Power Company and in turn was so succeeded by the Consumers' Power Company.

Early in 1915 the city of Saginaw, through its commissioner of light, water and sewers, advertised for bids for street lighting, and on January 19th of that year the Saginaw Power Company, then the owner of the plant, made a bid in writing, signed by its vice-president, J. A. Cleveland, to install and maintain the street lights at $50 per lamp per year. Accompanying this proposal in a sealed envelope was the following communication:

"January 19th, 1915.
"To the Commissioner of Light, Water, and Sewers,
"Saginaw, Mich.
"*Sir:* In the event of the council accepting our bid for furnishing electrical energy for lighting the streets, alleys, and public places of the city of Saginaw, and entering into a contract for the same, we will put into effect on the execution of the contract and maintain during the term of said contract, the following schedule of rates for residential and commercial lighting, heating and power (then follows a schedule of rates lower than the maximum rate of the ordinance and lower than the rates then in force):

"Nothing herein contained shall in any manner restrict, alter or affect the right of the city to secure the fixing of prices for electrical energy for light, heat and

213—Mich.—30.

power, as provided in franchise ordinance No. 119 of the city of Saginaw, the same being the franchise ordinance under which the contractor is operating.

"Yours respectfully,

"SAGINAW POWER COMPANY,

"By J. A. CLEVELAND,

"Vice-President."

Some of the citizens of Saginaw were at this time agitating the question of a municipally owned electric lighting plant. The commissioner of light, water and sewers in reporting to the council the bid for street lighting and the communication with reference to commercial lighting and power above quoted noted this agitation, but at the same time called attention to the fact that the proposal for street lighting was lower than the estimates of the city engineer and of Prof. Cooley, and that the proposal for a new schedule for resident and commercial lighting and power was as low or lower than the rates in other Michigan cities, with one possible exception. He, however, recommended that an election be held February 17th to vote on the question of a municipal plant, and that in the event such proposal did not carry at the election that the city enter into a contract with the power company for street lighting on March 1st "so that new resident, commercial and power rates may take effect on that date." The election was called and held, resulting in the defeat of the project for a municipal plant by substantially a two-to-one vote. Thereupon the contract for street lighting was entered into by the city and the power company. It bears date March 1, 1915. By the terms of the contract the power company was to proceed with diligence in installing the equipment so that the street lighting would be available October 1st. The power company also executed and delivered to the city the requisite bond in the sum of $10,000. Article 3 of the contract is as follows:

"*Term of Contract.* The provisions of this contract shall go into force and effect on the first day of October, 1915, and shall be binding for a period of five years; that is to say, until the first day of October, 1920; and shall be binding for an additional period of five years from and after the first day of October, 1920, unless the city, on or before the first day of April, 1920, shall notify in writing the contractor that the provisions of this contract shall terminate at the end of the five-year period, viz., the first day of October, 1920, and unless such written notice is given as herein provided, by the city to the contractor, all the terms and conditions of this contract shall be binding upon the parties hereto until the first day of October, 1925."

On March 1st, the date of the contract, the power company put in force the schedule of rates enumerated in its communication to the city of January 19th, and on the 1st of October the equipment had been installed and the power company commenced to furnish the city with light for its streets. It has since furnished such street lighting at the rate agreed upon and no question arises as to the street lighting contract or its performance except as it may be incidental to the question here involved.

On October 22, 1920, the Consumers' Power Company, then owner of the plant, sent a communication to the council of the city stating its claim that the communication of January 19, 1915, was not binding upon it, giving its reasons for such claim, and advising the council that from and after October 1st a schedule of rates contained in the communication would be charged for commercial lighting and power. This schedule of rates was higher than the one then in force, but not higher than the maximum fixed by the ordinance of November 30, 1908.

Shortly after receiving this communication the city filed its bill in the circuit court for Saginaw county against the Consumers' Power Company, setting up in

detail the transactions and dealings between the city and the power company and its predecessors, to which bill was attached numerous exhibits. It is the claim of the city, briefly stated, that the proceedings we have detailed constituted and made a contract binding the power company to furnish the city and its inhabitants with commercial light and power until October 1, 1925, at the rates fixed in the communication of January 19, 1915; that the enforcement of the rates fixed in the communication of October 22, 1920, would cost the city an extra thousand dollars a month for its commercial light and power and its inhabitants many thousands of dollars. It also insists that if all formalities have not been complied with in making the agreement that by reason of the fact that the rates fixed in the communication were sufficiently attractive to its citizens to cause them to defeat the plan for municipal ownership, that for the same reason it did not insist upon having the rates fixed by arbitration in 1918 for a period of 10 years following as it had a right to do under the ordinance, and because of the further fact that the power company has had the exclusive benefit for all these years of the patronage and business of the city and its citizens, it should now be estopped to question the validity of the contract or its existence or the proceedings leading up to and attendant upon its execution. The bill seeks specific performance of the contract and injunction to restrain the putting into force of the rates set out in the communication of October 22, 1920. The power company made a motion to dismiss this bill in the nature of a demurrer and also filed an answer. Upon filing the bill an order to show cause why a temporary injunction should not issue was entered and served. The motion to dismiss the bill and the return to the order to show cause came on to be heard before Judges Snow and Browne and both matters were fully argued. The motion to dis-

miss was denied and a temporary injunction was issued. We granted leave to appeal from the order overruling the motion to dismiss (No. 29,537) and at the same time issued an order to show cause directed to the circuit judges requiring them to show cause why mandamus should not issue directing them to set aside the order for a temporary injunction (No. 29,538). Both cases were placed at the foot of the January docket and ordered to be heard together. They were argued together, briefed together and will be disposed of in one opinion. In disposing of them we shall bear in mind that, in considering the motion to dismiss, the bill alone is before us and we must accept its allegations as true. In the mandamus case the full record and the return of the circuit judges are before us. We shall not follow the order adopted by counsel in their briefs but will give consideration to all questions discussed. This will require a somewhat extended opinion as many questions are raised and all are pressed upon the court with vigor and ability.

1. We agree with counsel for the power company that an ordinance may not be repealed or amended without action of equal dignity to that required in its enactment. *Chicago, etc., R. Co.* v. *City of Chicago,* 174 Ill. 439 (51 N. E. 596) ; 2 Dillon on Municipal Corporations (5th Ed.), § 571. It does not follow from this that the municipal action may not take another form as is pointed out by Judge Dillon in the section cited, nor is it necessary to here determine just what form such action should take, as we do not agree that any of the proceedings set out in the bill constituted an amendment of the ordinance of November 30, 1908. By that ordinance the predecessor of the defendant power company was given the use of the streets of the city, and, subject to the clause fixing the maximum rates and the one providing for arbitration, was given the right to charge for commercial light and power

rates which it might from time to time fix. This was a property right and it required no amendment of the ordinance to permit it to fix such rates for an agreed period or term or to make a binding contract with the city that it would exercise such right in a certain way, nor would such contract operate as an amendment of the ordinance. If there was a binding agreement between the city and the power company as to the exercise of this property right in a certain manner, a question we shall presently consider, it was no more an amendment of the ordinance than would be a contract made with a manufacturing company to furnish it with power and light at an agreed rate for an agreed term.

2. We cannot follow counsel for the power company in their contention that the communication of January 19, 1915, having reference to commercial light and power, was a gratuity simply, formed no part of the contract between the parties, and is not binding on the company. It is true that its terms were not incorporated in the street lighting contract. But the proposal did not contemplate that they should be. It reads:

"In the event of the council accepting our bid" for street lighting "and enter into a contract for the same, we will put into effect on the execution of the contract and maintain during the term of said contract the following schedule of rates for residential and commercial lighting, heating and power."

This was an offer on the part of the power company and the corporate action of the city accepting the bid for street lighting and directing the execution of the street lighting contract and its execution operated as an acceptance of the offer and constituted a contract between the parties. Its consideration was the street lighting contract, presumptively a valuable one for the power company, and the proposal contemplated that

upon its execution the proposal for commercial light and power automatically became a part of it. The rates provided in it were in fact at once put into effect by the power company. The two proposals were sent together and were a part of the same transaction and are to be considered together. *Sutton* v. *Beckwith,* 68 Mich. 303; *Cooper* v. *Pierson,* 212 Mich. 657; *Baller* v. *Spivack, ante,* 436, handed down herewith; *Kuennan* v. *Guaranty Co.,* 159 Mich. 122. The last-cited case involved a contract with a municipal corporation. The contract had not been formally executed by the contractor, but the bond had been. It was there said:

"Some reference is made to the fact that the construction company did not formally execute the written agreement. It did submit its proposal to do the work and it gave a bond conditioned for the performance of the work, in which reference is made to 'the foregoing contract.' It would appear from the printed record that the proposal, contract, and the bonds were so attached, and by references in each were so connected, as to constitute practically one complete transaction. The construction company entered upon the work and built the sewer under the contract. We hold there was a contract within the meaning of the statute presently to be referred to."

In *Henderson Water Co.* v. *Trustees,* 151 N. C. 171 (65 S. E. 927), the court had before it an action which had been brought by the water company to recover on the *quantum meruit* for water furnished free to the public schools. By the franchise and contract this was to be done. Disposing of the case the court said:

"If the plaintiff consented and agreed to it for the consideration furnished at the time by the town, what could vitiate this benefit? Regardless of how this might be determined in an action between other parties, we do not think the plaintiff ought to be permitted to recover as upon a *quantum meruit* for water already furnished under its stipulation for free water. When the ordinance of the town was accepted by the

plaintiff, the execution of the contract was complete; by it valuable rights were granted the plaintiff and important duties imposed. An acceptance of those rights is an assumption of those duties. As it is a contract which binds the town not to interfere with those rights, so likewise it is one which binds the plaintiff to the discharge of those duties."

3. Until October 1, 1920, the power company maintained the rates for commercial lighting and power enumerated in the communication of January 19, 1915. It is insisted by it that if there was a valid contract, which it denies, that it has fully complied with it and that it is at an end; that the contract, if one existed, terminated at that time; and that under the authority of *Brady* v. *Insurance Co.*, 11 Mich. 425, and *Ladies of the Maccabees* v. *Surety Co.*, 196 Mich. 27, it required a new contract, a new meeting of the minds to bind the parties for any further period. The later of these cases but followed the earlier one. Both are clearly distinguishable from the instant case. In the earlier of these cases we said:

"We have no doubt that each renewal of the policy was a new contract. Each was upon a new consideration, and was optional with both parties. At the expiration of the year over which the original policy extended, the obligation of the insurer was ended, and it was only by the concurrence of the will of both parties that the obligation could be continued."

In the later one it was said:

"Under the stipulations of the bond in the instant case, the renewal did not automatically take place. The plaintiff had to apply for, and the defendant accept, a continuance of the obligation. Neither could compel action on the part of the other. When the plaintiff applied for, and the defendant accepted the application, both parties became bound for a new term. It was a new contract; its conditions were the same as the original bond, but it covered a new period, was for a new consideration, and sprang into existence by the affirmative action of both parties."

In the instant case the power company in its proposal agreed to put into force and maintain the rates "during the *term* of said contract." We have quoted the article of the agreement controlling its term. A reference to it discloses that it continued until October 1, 1925, unless the city on or before April 1, 1920, terminated it by written notice. The contract automatically continued unless terminated by affirmative action. Neither party was required to take any affirmative action in order to make it a binding contract until October 1, 1925. The distinction between the cases cited and the one before us, we think, is clear. We hold that the term extended to October 1, 1925, and in the absence of the written notice, optional with the city to give, the parties were bound until that time.

4. This leads us logically to consider whether the contract as thus construed is *ultra vires* under section 3427, 1 Comp. Laws 1915. The portion of this section which is invoked and which we shall now consider reads as follows:

"*Provided*, That all contracts for lighting such cities or villages, as hereinbefore provided, shall be for a period not less than three nor more than ten years."

There is language in a further proviso following the one just quoted which has a bearing on another feature of the case to which we shall presently refer, but which is not necessary now to quote. The city and the power company have both treated the street lighting contract as valid, and in this proceeding it is not sought to litigate the right of the power company to charge, or the liability of the city to pay the rates therein agreed upon. Its validity is, however, indirectly involved. Manifestly if the street lighting contract is *ultra vires* and void it cannot furnish a valid consideration for another contract or another part of the same contract. We understand this to be the attitude of counsel in approaching the question

now under consideration, and we do not understand that we are asked to determine its validity for the purpose of relieving either of the parties from its terms. Under these circumstances it is not a moot question but requires our consideration.

It will be borne in mind that the contract is dated March 1, 1915. It provides a period of seven months in which the company is to install its equipment and a 10-year period for operation, terminating October 1, 1925. It is pointed out by counsel for the power company that the hands of the city are thus tied for a period of 10 years and 7 months, and it is claimed that this is *ultra vires* of the municipality. Counsel rely principally on *City of Somerset* v. *Smith*, 105 Ky. 678 (49 S. W. 456), to sustain this contention. This case has been cited many times by courts and textbook writers and it is possible we would not be inclined to disagree with the result reached as applied to the facts there before the court. The constitution of Kentucky prohibited municipalities from granting franchises or making contracts in reference thereto for a term exceeding 20 years. The defendant had an existing franchise for 10 years expiring in 1900. In 1897 the city granted him a further franchise to begin at the expiration of his then existing franchise and to run for 20 years from that date. In that case the equipment was already installed, no time was necessary to prepare for the execution of the franchise and it was patent that the proceedings were designed to circumvent the constitutional inhibition. We are not convinced that the Kentucky court has overruled this holding in the later cases as contended by counsel for the city, although the following language was used in the case of *City of Princeton* v. *Power Co.*, 166 Ky. 730 (179 S. W. 1074):

"The purchaser of a franchise should have a reasonable time, before the beginning of the term of his

franchise, to prepare the necessary machinery and fixtures to enable him to exercise his franchise in a way beneficial to himself and the patrons of the operations of his franchise; but the time should not be so great as to make it apparent that the arrangement looks more to the benefits of the purchaser of the franchise than it does to those of the public."

And in *S. R. Schaff & Co.* v. *City of LaGrange*, 176 Ky. 548 (195 S. W. 1097), the court had before it both a franchise and a contract. The franchise was for the term of 20 years while the contract was for 20 years after the lights were turned on, which was some 4 months after its execution, and the court held that the contract was not entirely void but was valid and enforceable for the period of the life of the franchise.

The New Jersey court has had before it the precise question here involved under a similar statutory provision. In *Van Giesen* v. *Bloomfield*, 47 N. J. Law, 442 (2 Atl. 249), it was said by that court:

"The validity of the contract is also assailed because it was executed August 1, 1883, and by its terms is made binding for a period of ten years from the 1st day of January, 1884. This is alleged to be in contravention of the provision of the act of 1881, that no contract shall be made for a longer period than ten years in any one term. Where, as in this case, it was necessary for the water company to construct works to furnish the requisite supply of water, it must have been within the contemplation of the law-maker that a reasonable time would be allowed for the contract to begin. It could not reasonably be supposed that any company would incur the expense incident to such an undertaking without a contract first executed with the municipality to be served. The substantial feature of the restriction is that no more than ten annual tax levies shall be contracted for at one time. The granted power has not in this respect been overstepped."

Counsel for the city also cite *State* v. *Gas Co.*, 69 Kan. 45 (76 Pac. 447). We do not perceive that this case is applicable. The case and the authority upon

which it is based (*Gormley* v. *Day,* 114 Ill. 185 [28 N. E. 693]) have to deal with ordinances and both are bottomed upon the power of a municipality to repeal ordinances, a doctrine not applicable to binding municipal contracts. This leaves the Kentucky and New Jersey cases as the only ones precisely in point from courts of last resort on the question now before us which the diligence of counsel has brought to our attention. Such independent investigation as the limit of time at our disposal has permitted has not revealed others. Cases applicable by analogy will be found. There are numerous cases where contracts and franchises have been held to be void because in excess of the statutory or constitutional period, but they do not involve the question of whether the utility may have a limited time, a reasonable time, in which to install equipment in addition to the statutory or constitutional limit of time. The question is an open one in this jurisdiction. We must announce the rule applicable here. We hold that the provision of the statute above quoted is not offended against where the contract for service is for 10 years, and a reasonable time, and but a reasonable time, antedating the beginning of the contract is provided for in which to install the equipment.

The provision we have quoted inhibits contracts for public lighting and is not restrictive of the power of the municipality to contract for the benefit of its inhabitants. Where there is no statutory restrictions upon the term for which contracts may be executed, the courts and textwriters generally agree that a contract for a reasonable time may be made. What is a reasonable time has been the subject of some disagreement, but we are satisfied that the period here involved, 10 years and 7 months, is not so unreasonable that we should so hold, as matter of law, or that we should hold that the portion of the contract which is

for the benefit of the inhabitants of the city is void. On the contrary we are of opinion that it is enforceable in their behalf.

But it is urged by counsel for the power company that light and power furnished the city in addition to the street lighting is within the provision of the statute; that electricity is used to light its public buildings and that power is furnished for its municipal activities, and that this is public lighting within the inhibition of the statute; and that here the contract for such light and power covers a period of 10 years and 7 months and. must fall as *ultra vires.* We do not regard it as important to here determine this question as the contract for furnishing light and power to the city as a consumer will be disposed of in another branch of the case.

5. The argument is made that the offer to furnish to the inhabitants of the city light and power at a reduction from the then prevailing rates on condition that the city enter into a street lighting contract influenced the deliberations of the council, was an unlawful inducement to the city to enter into the contract, was no part of the advertisement for bids so that other bidders might know all the benefits to be received by the contract, is against public policy and renders the contract void and unenforceable. This contention would have great, if not irresistible force, if it was being urged upon us by a competitive bidder (*Louchheim* v. *Philadelphia,* 218 Pa. 100 [66 Atl. 1121]), or by a taxpayer (*Inge* v. *Board of Public Works of Mobile,* 135 Ala. 187 [33 South. 678]; *Diamond* v. *City of Mankato,* 89 Minn. 48 [93 N. W. 911, 61 L. R. A. 448]; *Le Tourneau* v. *Hugo,* 90 Minn. 420 [97 N. W. 115]), or by the attorney general (*Attorney General, ex rel. Allis-Chalmers Co.,* v. *Detroit Lighting Com'n,* 155 Mich. 207). But we do not think the power company may be now heard to urge its own wrong, if it be a wrong, to defeat the

executory portion of the contract after it has had the
benefit of the executed portion of it during its profit-
able years. Let us recall the circumstances under
which the contract was made: The power company was
then in absolute control of the lighting and power sit-
uation at Saginaw; it had no competitors; the citizens
were considering a municipally owned plant which, if
erected, took from the power company its street light-
ing business and made a competitor for commercial
lighting and power; the city engineer and Prof.
Cooley had advised the city as to the probable cost
of street lighting under municipal ownership; the au-
thorities had investigated the cost to consumers of
light and power in other cities; and the power com-
pany undoubtedly knew that the city was armed with
this information, and would not contract for light and
power for itself or its citizens except at a reasonable
rate. The defeat of municipal ownership, the con-
tracting for a period of 10 years for street lighting
and commercial light and power, would give the com-
pany virtually a monopoly of the business in its line
for that period. Such a contract in a city of the size
of Saginaw was of great value to the company. There
were, and the power company must have known there
would be, no competitive bidders. With this as the
situation it made its bid for lighting the streets and
accompanied its bid with its proposal to furnish com-
mercial light and power at reduced rates from the then
prices. Under these circumstances if the proposal for
furnishing commercial light and power was an im-
proper one and prejudicially operated upon the minds
of the members of the council it does not lie with the
power company to so contend after it has had the
benefit of over half of the term of the contract and is
called upon to perform the executory portion thereof.
Under these circumstances it is estopped to plead its

own wrong to defeat the executory portion of a contract thus obtained by it or its predecessor.

6. In the statute above cited (1 Comp. Laws 1915, § 3427) and following the provision hereinbefore quoted is found the following:

"*And provided further*, That such contract shall be entered into in the manner prescribed by the charter of such city or village for the letting of contracts for public lighting."

The charter of the city of Saginaw contains the following provision:

"No contract for the expenditure by the city of a sum exceeding $250 for any purpose whatsoever, shall be entered into unless the same shall be let upon competitive bids in the manner herein described."

The contract between the city and the power company for lights other than street lights and for power was not let at a competitive bidding and the facts set up in the bill and the records before us demonstrate that the contract required an expenditure by the city of more than $250 per month and a very large sum covering the period of the contract. Without such competitive bidding, could a valid contract be entered into between the power company and the city as a consumer? We must, in approaching this question, have in mind that we are here dealing with only the executory portion of this contract, and at present we are only considering whether the city as a consumer of light and power has obligated itself by a binding contract to take such light and power from the power company at the agreed rate until October 1, 1925.

That a municipal corporation having the power to do a certain act may bind itself, although in the exercise of such power it does not strictly observe the formalities prescribed by its charter—that a city which has the power to contract and enters into a con-

tract *intra vires,* but the infirmity in the corporate action lies only in the defective execution of the power possessed, is nevertheless bound—will be found to be demonstrated by a long line of authorities. Some of these cases base decision on the ground of estoppel, others on the ground of ratification, and others evidently upon the ground that certain charter provisions as to formalities in the execution of the power are directory. Among the numerous cases see *Edwards* v. *City of Kirkwood,* 147 Mo. App. 599 (127 S. W. 378) ; *Peterson* v. *Mayor, etc., of New York,* 17 N. Y. 449; *Aspinwall-Delafield Co.* v. *Aspinwall Boro,* 229 Pa. 1 (77 Atl. 1098) ; *Pope Manfg. Co.* v. *Granger,* 21 R. I. 298 (43 Atl. 590) ; *Hanson* v. *Inhabitants of Dexter,* 36 Me. 516; *City of Mt. Vernon* v. *State,* 71 Ohio St. 428 (73 N. E. 515, 2 Ann. Cas. 399) ; *State* v. *City Council,* 19 Mont. 518 (49 Pac. 15) ; *City of Colorado Springs* v. *Colorado City,* 42 Colo. 75 (94 Pac. 316) ; and our own cases, among others being *Carey* v. *City of East Saginaw,* 79 Mich. 73; *Coit* v. *City of Grand Rapids,* 115 Mich. 493; *Ludington Water-Supply Co.* v. *City of Ludington,* 119 Mich. 480; *Belding Land & Improvement Co.* v. *City of Belding,* 128 Mich. 79.

These cases and many others we have examined, we think, sustain this rule: Where the power exists in the municipality, where the contract is *intra vires,* and there is no mandatory charter, statutory, or constitutional provision offended, the municipality is bound, although the corporate power is not exercised with the strict formalities provided in a charter or statutory provision that is directory merely.

Is the provision of the charter of the city of Saginaw now under consideration a mandatory or a directory provision? The provision requiring competitive bidding is one common to most municipal charters. It is a provision designed for the protection of

the public. Speaking of such provisions, it is said in 20 Am. & Eng. Enc. Law (2d Ed.), p. 1165:

"The object of such provisions is, it has been said, to 'prevent favoritism, corruption, extravagance, and improvidence' in the awarding of municipal contracts, and they should be so administered and construed as fairly and reasonably to accomplish such purpose."

That a provision requiring competitive bidding is mandatory, that the municipality is not bound by contracts made in defiance of it, finds support in the great weight of authority and is in accordance with the holdings of this court. Among the many cases see *Zottman* v. *San Francisco,* 20 Cal. 96; *Richardson* v. *Grant County,* 27 Fed. 495; *Brady* v. *Mayor, etc., of New York,* 16 How. Prac. 432; *Buchanan Bridge Co.* v. *Campbell,* 60 Ohio St. 406 (54 N. E. 372); *La France Fire Engine Co.* v. *City of Syracuse,* 68 N. Y. Supp. 894; *Smeltzer* v. *Miller,* 125 Cal. 41 (57 Pac. 668); *Springfield Milling Co.* v. *Lane County,* 5 Or. 265; *Cawker* v. *Paving Co.,* 140 Wis. 25 (121 N. W. 888). We do not by citing these cases thereby approve of all that was said in all of the opinions. The case of *Attorney General, ex rel. Allis-Chalmers Co.,* v. *Detroit Lighting Com'n, supra,* is illustrative of the holdings of this court on the subject.

The city was not, and is not, bound by its contract made with the power company without competitive bidding and in violation of the mandatory provision of its charter. Not being bound by the contract it cannot by bill for specific performance compel the power company to perform a contract that lacks mutuality. A public service corporation is bound from the very nature of its business to furnish such public service in such quantities as the public may require, and when called upon by the public for such service it cannot interpose as a defense that the contract under which it

is furnishing such service lacks mutuality because a definite amount thereof is not agreed upon. We do not use the term "lack of mutuality" in this sense. But where the city was not bound from the execution of the contract to perform its terms or any of them, then there is a lack of mutuality, and it is to this lack of mutuality that we here refer.

We have thus far under this head considered the rights of the city as a consumer of commercial light and power. We have reached the conclusion that it may not as such consumer of commercial light and power maintain this bill for the specific performance of a contract by the terms of which it is not bound. By the bill no question of discrimination is raised and relief is solely sought by virtue of the contract. The contract being an unenforceable one, the city as an entity, as a consumer of power, is without relief by way of specific performance on the facts stated in the bill.

But it does not follow that the city may not maintain this bill on behalf of the public, on behalf of its citizens, on behalf of the consumers of commercial light and power. We have already pointed out that contracts for private commercial lighting and power do not fall within the inhibition of section 3427, 1 Comp. Laws 1915, and that the contract was a valid and enforceable one so far as it relates to the inhabitants of the city. Because the city is not entitled to all the relief it asks it does not follow that it is not entitled to any. Upon a motion to dismiss, the bill should be sustained if any ground for equitable relief is stated, even though imperfectly. *Watson* v. *Wagner,* 202 Mich. 397; *Dewey* v. *City of Flint,* 205 Mich. 195. We think the city as representative of its inhabitants may maintain this bill in their behalf and thus avoid a multiplicity of suits. In *Muncie Natural Gas Co.* v. *City of Muncie,* 160 Ind. 97 (66 N. E. 436, 60

L. R. A. 822), the court, speaking through Mr. Justice Gillett, said:

"As applied to this case, it is a matter of public expediency that by one suit rights shall be established for the time that the injunction has to run, instead of hundreds of the inhabitants of the city being each compelled to sue to vindicate his right, or otherwise to submit to a small but annoying injustice."

See, also, 5 Fletcher, Cyclopedia Corporations, § 3330; *Cumberland Telephone & Telegraph Co.* v. *City of Hickman*, 129 Ky. 221 (111 S. W. 311); *City of Wheeling* v. *Gas Co.*, 74 W. Va. 372 (82 S. E. 345).

7. That the courts are not deprived of jurisdiction of this controversy by reason of terms of Act No. 419, Public Acts 1919 (the act creating the public utilities commission), is, we think, clear. There is no question of adequate service involved and the commission has no acquired jurisdiction of the matter as was the case of *Oceana Farmers' Mutual Tel. Co.* v. *Telephone Co.*, 205 Mich. 662. In section 4 of the act above cited is found the following provision:

"In no case shall the commission have power to change or alter the rates or charges fixed in, or regulated by, any franchise or agreement heretofore or hereafter granted or made by any city, village or township."

See, also, *City of Monroe* v. *Railway Co.*, 187 Mich. 364.

8. It is insisted that Mr. Cleveland, who signed and sent the communication of January 19, 1915, was not authorized so to do by the power company. The bill makes a case of apparent authority and should not be dismissed for this reason.

It follows from what we have said that the order overruling the motion to dismiss the bill (case No. 29,537) must be affirmed and the case remanded for a hearing upon such testimony as the parties may see

fit to introduce. It also follows that there was no abuse of discretion on the part of the circuit judges in granting a temporary injunction restraining the collection of the new rates from the inhabitants of the city, consumers of light and power, but that the injunction should be modified so as to eliminate the city as a consumer of commercial light and power from its terms and benefits. If necessary a mandamus will issue in case No. 29,538 compelling such modifications. The costs of these cases will abide the final outcome.

STEERE, C. J., and MOORE, WIEST, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.