THE STATE OF DELAWARE, upon the relation of James R. Morford, Attorney-General, v. RALPH W. EMERSON, DONALD P. ROSS and CHARLES D. ABBOTT.

330

(*December* 29, 1939.)

RODNEY and SPEAKMAN, J. J., sitting.

*Hugh M. Morris* and *S. Samuel Arsht* for Relator.

*P. Warren Green and Henry M. Canby* for defendants.

Superior Court for New Castle County, No. 266, September Term, 1939.

Rodney, J., delivering the opinion of the Court:

We shall consider these questions in their order, as presented by the Relator. The Relator contends:

1 (a) That under *Art. II, Sec.* 19 of the Delaware Constitution of 1897 the Act required an affirmative vote of two-thirds of all the members elected to each House of the General Assembly, and

(b) That under *Art. VIII, Sec.* 3 of the *Constitution* the *Act* required an affirmative vote of three-fourths of all the members of each House.

The Relator contends that the *Act* in question did not receive either the two-thirds vote required under one provision, nor the three-fourths vote required under the other, and therefore was not validly enacted.

The defendants claim that the Court may not examine into the quantum of votes as shown by the *Legislative Journals*, for they claim that the *Enrolled Bill Doctrine* has been

adopted by *Constitutional Amendment* as the law of the State of Delaware, and that under that doctrine the enrollment of the *Bill* has determined the validity of its passage.

The Relator denies that the Courts are precluded from considering the legislative vote where the issue is whether or not a *Bill* was passed by the majority prescribed by the *Constitution.*

It is unnecessary in this case to determine the applicability of the *Enrolled Bill Doctrine*, for it is conceded by both sides to this controversy that the *Act* in question was passed in the first instance by a majority of votes in each House of Assembly and, after veto by the Governor, by three-fifths of all the members elected to each House. We must first then determine whether there be any constitutional provision requiring in the first instance a greater vote for this *Act* than a majority vote, and this inquiry leads us directly to the Relator's contentions, which will be considered in their order.

(a) The Relator contends that, for the passage of the *Bill*, it was required by *Art. II, Sec.* 19, that such *Bill* should receive a vote of two-thirds of all the members elected to each House. The provision is as follows:

"The General Assembly shall not pass any local or special law relating to fences; the straying of livestock; ditches; the creation or changing the boundaries of school districts; or the laying out, opening, alteration, maintenance or vacation, in whole or in part of any road, highway, street, lane or alley; [provided, however, that the General Assembly may by a vote of two-thirds of all the members elected to each House pass laws relating to the laying out, opening, alteration or maintenance of any road or highway which forms a continuous road or highway extending through at least a portion of the three counties of the State.]"

The first part of the section, and down to the word "provided", was the original section as adopted in 1897. The concluding portion of the section, commencing with the word "provided" and included in the square brackets,

was proposed as an amendment in 1911 (*Vol.* 26, *c.* 2, *Laws of Delaware*), and adopted in 1913 (*Vol.* 27, *c.* 2).

Prior to 1897 the Legislature had plenary power to enact local and special legislation on almost any subject, and our *Session Laws* are replete with instances of the exercise of that right. Many States, however, at an early date perceived that unlimited special or local legislation encouraged legislative trading, log-rolling, and the advancement of private rather than public or general interests. Most jurisdictions have, today, constitutional provisions limiting the power of the Legislature to enact special or local laws. 25 *R. C. L.* 820; *Note,* 93 *Am. St. Rep.* 106. This was the origin and the reason for *Art. II, Sec.* 19 of the *Delaware Constitution.* By this section the Legislature was absolutely prohibited from passing special or local laws with reference to a number of subjects—of which we are now only interested in roads and highways. By the section the Legislature was absolutely prohibited from passing local or special laws with reference to "the laying out, opening, alteration, maintenance or vacation, in whole or in part of any road, highway, street, lane or alley."

It mattered not whether such local or special legislation was passed by a majority vote, by two-thirds majority, or passed unanimously. The Legislature from 1897 and until 1913 was absolutely prohibited from enacting such local or special legislation. At no time, however, was the Legislature prevented from affecting such subjects by general law. As to this they had unlimited authority.

Such was the situation when the amendment to the *Constitution* was adopted March 17, 1913 (*Vol.* 27, *c.* 2). The defendants suggest that the amendment proposed in 1911 was a step in the development of the duPont Highway, which had been inaugurated in 1911, and that the amendment was designed as a means to permit, if neces-

sary, special legislation with reference to that highway. Some of the history of that road may be found in *Clendaniel v. Conrad*, 3 *Boyce* (26 *Del.*) 549, 83 *A.* 1036, *Ann. Cas.* 1915*B*, 968. The relation of the dates lends some plausibility to the suggestion, but we are not concerned with the origin but rather with the effect of the amendment.

The defendants deny that *Art. II, Sec.* 19 of the *Constitution* has any bearing whatever on the present *Act.* The present *Act,* they contend, has nothing whatever to do with the "laying out, opening, alteration, maintenance or vacation, in whole or in part of any road, highway, street, lane or alley"; that the present *Act* merely provides for the reorganization of the Highway Department as to its membership and such other modifications as are made necessary by the change of personnel. Passing this question for the moment, we come directly to the *Constitutional Amendment.*

The defendants contend that both the purpose and effect of the *Amendment* was solely to allow the Legislature by a two-thirds vote of each House to adopt special or local legislation with reference to the "laying out, opening, alteration or maintenance of any road or highway which forms a continuous road or highway extending through at least a portion of the three counties of the State." In other words, the defendants claim that prior to the *Amendment* the Legislature could pass any general law with reference to roads or highways, but could pass no special or local law, whatever, pertaining to that subject; that after the *Amendment* the Legislature could still, as previously, pass any general law with reference to roads or highways, and could by the required vote of two-thirds of each House pass local or special laws with reference to continuous roads or highways which ran at least in some portion of each of the three counties of the State.

It is conceded that the *Act* under discussion is a general *Act.*

The Relator concedes that prior to the *Amendment* the Legislature could pass any general *Act* with relation to roads or highways, and could pass no local or special laws, whatever, with reference to that subject. The Relator also concedes that the *Amendment* operates as a grant of power to the Legislature to enact, by a vote of two-thirds of the members of each House, local or special laws with reference to continuous roads or highways which extend through a portion of each of the three counties of the State. The Relator, however, contends that the *Amendment* applies not only to local and special laws but to all laws, and that it operates as a limitation on the power to enact general laws with reference to continuous roads or highways extending into each county of the State, and that, after the passage of the *Amendment,* such general laws required a vote of two-thirds of the members of each House.

We cannot agree with this contention. We see no evidence, whatever, that the *Constitutional Amendment* was intended to or could operate as a limitation on the power of the Legislature to pass general laws with reference to roads or highways. To us it would seem a strained and illogical construction of the *Amendment* to make it to so operate that the Legislature by a majority vote could pass general laws affecting non-continuous roads in all three counties of the State, but that any road that was intended to run continuously through two counties and into the third county would require a vote of two thirds of all the members elected to each House of Assembly. We know of no rule of construction which would require such a conclusion.

We are of the opinion that the purpose and effect of the *Constitutional* provision was to grant authority to the Legislature by two-thirds vote of each House to enact

local or special legislation with regard to the laying out, opening, alteration or maintenance of any road or highway which forms a continuous road or highway extending through at least a portion of the three counties of the State, but that said amendment did not relate to the power of the Legislature to enact general legislation with reference to the subject matter.

We think the *Act* now being  considered did not require a vote of two-thirds of all the members of each House under the provisions of *Art. II, Sec.* 19.

1. (b) We now come to the contention of the Relator that the *Act* in question required a vote of three-fourths of all the members elected to each House of the General Assembly, pursuant to *Article VIII, Sec.* 3 of the *Constitution.* This section provides:

"No money shall be borrowed or debt created by or on behalf of the State but pursuant to an Act of the General Assembly, passed with the concurrence of three-fourths of all the members elected to each House."

Now, of course, it is immediately apparent from an inspection of the *Act* now being considered (*Laws* of *Delaware, Vol.* 42, *c.* 173) that there is therein no mention of money being borrowed or debt created on behalf of the State. It may well be that all question of application of this provision of the *Constitution* should be postponed, and only considered when issuance of bonds or creation of debt make such question pertinent. We prefer, however, to carefully examine each question suggested by the Relator. What the *Act* does is to attempt to change the membership of the Highway Commission, and it contains certain other provisions having no reference to the creation of a debt.

The Relator, however, contends that since the original *State Highway Act* did provide, by a continuing power, for the borrowing of money and the creation of a debt on behalf of the State, thereby requiring for its passage a vote

of three-fourths of all the members of each House, so no amendment of that *Act* can be had without a like affirmative vote of three-fourths of all the members of each House.

The specific contention of the Relator is:

"An Act required by the *Constitution* to be adopted by a vote greater than a simple majority can be amended or repealed by the Legislature only by another Act of equal dignity and which has received not less than the number of votes required for passage of the original statute."

■ We might admit that an *Amendatory Act* was required to be of "equal dignity" with the original Act if we knew just what the implication of such term might be. It is clear that the term "equal dignity" has no necessary reference to the number of votes required by the *Amendatory Act,* for the term was used in Chicago, *I. & L. R. Co. v. Town* of *Salem,* 166 *Ind.* 71, 76 *N. E.* 631, and in *City* of *Saginaw v. Consumers' Power Co.,* 213 *Mich.* 460, 182 *N. W.* 146, and in neither of these cases was the required number of votes either involved or discussed. If by the term "equal dignity" it is meant that the *Amendatory Act* must be adopted with like or equal formality as the original statute, then we are in entire agreement.

The contention of the Relator is that when a proposed Bill authorizes or contemplates the creation of a debt against the State, thus requiring a vote of three-fourths of each House of Assembly, and when such legislation has received such vote and has become a law, that thereafter no repeal or amendment of the statute may be had except by legislation receiving a similar vote of three-fourths of the members elected to each House.

The Relator has drawn no distinction between the two cases of repeal of an existing statute, on the one hand, and an amendment of an existing statute on the other. We are primarily only interested in the question of vote required

for an amendment to an existing *Act* which had required and received a three-fourths vote upon its original passage.

█ █ It is therefore perhaps unnecessary in this case to discuss the question as to whether an *Act* providing for or allowing the creation of a debt against the State, and thus requiring a three-fourths vote for its passage, may not be absolutely repealed by a lesser vote. Certainly, the reasons requiring the larger vote, viz. the desire to protect the State from the burden of debts of doubtful wisdom and requiring a large preponderance of public sentiment for the creation of the debt, can have no pertinency or application, for by the repeal of the *Act* the State is protected from any possibility of the debt and the status is as if the debt had not been authorized. A majority vote is the normal vote of the Assembly, and a greater numerical vote is necessary solely in those instances where the *Constitution* expressly requires it. *Art. II, Sec.* 10 of the *Constitution* recognizes the normal vote required by providing that no *Bill* shall pass either House of the General Assembly without the concurrence of a majority of the members elected to each House. An *Act* repealing an *Act* is, in itself, a new *Act*, and unless it contains something which, by the *Constitution* could only be adopted by a vote greater than a majority vote, then it would seem that a majority vote would be sufficient for its passage. No authority opposed to this view has been presented to us nor been disclosed by an exhaustive and independent research. In Ohio it was expressly *held* "that it does not require a two-thirds vote of the general assembly to repeal an act requiring the two-thirds vote by the constitution for its enactment." *State of Ohio v. Voris*, 8 *Ohio N. P.* 16, 10 *Ohio Dec.* 451, 452; *Backenstoe v. State*, 2 *Ohio N. P.* (*N. S.*) 178, 14 *Ohio Dec.* 580; *State ex rel. Flinn v. Wright*, 7 *Ohio St.* 333.

We must now consider the quantum of vote necessary to amend the *Act* creating the State Highway Department.

As found in the *Revised Code* of 1935, the legislation concerning the State Highway Department constitutes *Chapter* 166, and consists of five articles and forty-four sections. The *Act* under present discussion amends three of these sections. None of the amendments concerns the issuance of bonds or the creation of a debt. The original *Act* creating the State Highway Department was approved April 2, 1917 (*Vol.* 29, *c.* 63). As originally enacted it consisted of twenty sections. A few of these sections concerned the issuance of bonds and the creation of a debt against the State, so the *Act* required and received a vote of three-fourths of all the members elected to each House, because being an entire *Act* the vote was as to the passage of the *Act* as a whole. The great majority of the sections, however, in no way concerned the creation of a debt. The original *Act* has been amended upwards of twenty times, and when some of these amendments related to the creation or existence of a debt against the State, such as *Chap.* 54 of *Vol.* 32, the *Amendatory Act* received a three-fourths vote of both Houses. A great number of the *Amendments*, however, had no relation to the creation or existence of a debt at all, and many of the *Amendments*, as shown by the enacting clause, were passed by a mere majority vote of each House. At least two of these *Amendments*, receiving less than three-fourths vote, have a strong similarity to the present case. These two *Amendments* made changes in the personnel of the Highway Department. By *Vol.* 32, *c.* 52, the Governor of the State was removed as a member of the Department and the Secretary of State was substituted, and by *Vol.* 36, *c.* 79, the Governor replaced the Secretary of State as a member of the Department. The Relator, however, contends that the mere fact that many amendments have been passed without the vote of three-fourths of the members of each House is not determinative of the legality of the *Acts*, for, he contends, the passage of each may have

been unlawful. Without reliance upon the procedure of the past, we prefer to examine the matter upon principle.

When the original *Act* was passed in 1917, it would have required but a majority vote in each House, had the *Bill* contained nothing of a nature which by the *Constitution* required a greater vote. In other words, the vote of three-fourths of the members of each House of Assembly which the original *Highway Act* required and received, was because such original *Act* provided for the creation of a debt against the State, and this provision, by the *Constitution,* required a three-fourths vote of each House.

█ █ If, upon the original passage of the *Highway Act* in 1917, the statute had not received the three-fourths vote of each House, only that portion of the *Act* would have been invalid which required a three-fourths vote, and did not in fact receive it, and that portion of the statute would have been valid which required but a majority vote. It is a well settled principle of statutory construction that where a statute contains two matters of severable nature, and one matter contravenes the *Constitution* and the other does not, then only that part will be held void which is violative of the *Constitution,* and the other part will be valid. *Coleman v. Rhodes,* 5 *W. W. Harr.* (35 *Del.*) 120, 159 *A.* 649; *State ex rel. Green v. Isaacs,* 6 *W. W. Harr.* (36 *Del.*) 110, 171 *A.* 627; *Becker v. State,* 7 *W. W. Harr.* (37 *Del.*) 454, 185 *A.* 92.

█ █ Of course, where a stipulated subject matter, such as the creation of a debt against the State, requires a vote of three-fourths of all the members elected to each House of Assembly, we agree that such subject matter may not be afterwards enlarged by amendment by means of a lesser vote. Where, however, a statute consists of severable parts, and a portion would not have required for its original enactment more than a majority vote, we see no reason

why this part of the Statute may not be amended by that same vote which would have been sufficient for its original enactment, had it been in fact severed from the part requiring a greater vote. Both reason and authority sustain this view.

In *Mendelson v. Miller,* 11 *Ohio N. P.* (*N. S.*) 586, 21 *Ohio Dec.* 377, it was *held* that an *Act* requiring for its passage a two-thirds vote could be amended by a lesser vote where the *Amendatory Act* was a mere modification of the original. See, also, *O'Neil v. Jennette,* 190 *N. C.* 96, 129 *S. E.* 184. In *Dahlsten v. Anderson,* 99 *Minn.* 340, 109 *N. W.* 697, the question was whether an original statute creating a Court and requiring a two-thirds vote could be amended by a lesser vote. The Court said

"But when the court is once created, the Legislature may, as to matters of practice and procedure, amend and modify the act creating it, under the rules applicable to ordinary legislation."

We have carefully examined the authorities cited by the Relator, and especially *Palmer v. Bank of Zumbrota,* 72 *Minn.* 266, 75 *N. W.* 380; *Cottrell v. Town of Lenoir,* 173 *N. C.* 138, 91 *S. E.* 827, and *Caples v. Cole,* 129 *Tex.* 370, 102 *S. W.* 2d 173, 104 *S. W.* 2d 3. We see nothing in these inconsistent with the view herein expressed.

Without determining that the question of the issuance of bonds or creation of a debt on behalf of the State is here involved at all, we do not think the present *Act* invalid because of its failure to obtain the three-fourths vote of each House, as required by *Art. VIII, Sec.* 3.

2. We now come to the question of the title of the *Act.* This title was *"An Act To Amend Chapter* 166 *Of The Revised Code Of Delaware,* 1935, *Providing For Reorganization Of The State Highway Department."* It is insisted that the title is violative of *Art. II, Sec.* 16 of the *Constitution,* which provides

"No bill * * * shall embrace more than one subject, which shall be expressed in its title."

It is argued that the change of the term of office of the members and a contingent and temporary power in the Board to fill certain vacancies are not germane to the subject matter of the *Bill,* as expressed in its title. of *"Reorganization Of The State Highway Department."* Many authorities in this State have considered the quoted provision of the *Constitution* and have indicated its purpose and intent. *In re Cypress Farms Ditch,* 7 *W. W. Harr.* (37 *Del.*) 71, 180 *A.* 536; *Discount & Credit Corp. v. Ehrlich,* 7 *W. W. Harr.* (37 *Del.*) 561, 187 *A.* 591.

▮▮▮▮▮▮▮ It is well established that the title of a *Bill* is not required to be an index of the details of the *Bill* itself, or synopsis of the means by which the object of the *Bill* is to be effectuated. It is sufficient if the title is so framed as to apprise those interested in the subject matter of legislation so as, reasonably, to lead to an inquiry into the body of the *Bill.* We think that a title of an *Act* providing for the "Reorganization of the State Highway Department" gives to both legislators and citizens in general full knowledge and warning that the organization and affairs of the Department may be the subject of change, and invites the inquiry of all persons interested.

We think the statute not invalid because of its title.

3. We now come to the third and last question presented by the Relator, viz.:

"as to whether or not the Act is invalid as being an encroachment upon the executive powers of the State which are vested by the *Constitution* in the Governor."

The Court, as presently constituted, considered this question in *State ex rel. Morford v. Emerson,* 1 *Terry* (40 *Del.*) 233, 8 *A.* 2d 154. We adhere to the views there expressed and shall not unduly enlarge upon them.

A multitude of cases and authorities could be added to the effect that insofar as the legislative branch of the General Assembly is concerned, constitutional provisions, in general, operate as limitations rather than grants of power; that except as a limitation on the power of the Legislature to enact legislation is found in the *Constitution*, such limitation does not exist. The citation of support for these principles would serve no useful purpose for there seems little, if any, dissent therefrom.

Because, however, the present Relator while seeking the same relief as heretofore sought has presented a new approach and advanced an entirely different reasoning to support his views we shall briefly consider this new position.

The present Relator denies any intention to contend that powers of appointment to office rest exclusively in the Governor; the present Relator expressly concedes that the Legislature may create offices which are legislative or quasi-legislative in character, and exercise the power of appointment to such offices.

The present Relator contends, however, that the legislative right to fill offices is confined to legislative instrumentalities, and in the Governor is vested the right to fill offices in executive departments, and as the Relator assumes the State Highway Department is an Executive Department, so he logically from this hypothesis arrives at the conclusion that in the Governor lies the power to appoint to offices in the State Highway Department.

Without, in the slightest degree, receding from our former opinion, we venture to inquire when the care, custody, maintenance and jurisdiction of roads or highways ceased to be a legislative function and became subject to the Executive Department?

In 1 *Elliott on Roads and Streets*, § 509, it is said:

"Power over roads and streets resides in the Legislature and except insofar as restricted by constitutional provisions, the legislative power is practically unlimited."

So, indeed, are all of the authorities.

But it is not necessary to go for authority beyond the limits of this State. From the earliest times the full and entire jurisdiction over roads and highways has been exercised by the Legislature of this State. Every single volume of our statutory law, down to 1897, is full of general and special legislation concerning both public and private roads. Indeed, it was partly the great mass of this legislation, this unlimited exercise of legislative control over the roads and highways of this State, that led to the constitutional provision heretofore mentioned in this opinion, by which this control by the Legislature is required to be by general law and not by special *Act* except in the stipulated way by a two-thirds vote of each House. The *Constitution* of 1897 recognizes the jurisdiction to provide for roads and highways by general legislation, and the Legislature has passed general legislation in furtherance of the constitutional provision. Prior to the *Constitution* of 1897 the Legislature repeatedly and on numberless occasions provided by special *Act* for certain roads and named in the *Act* of *Assembly* those persons who were to act as commissioners to carry the *Act* into effect. The Legislature has passed general laws empowering the Courts to name commissions and to have a certain jurisdiction over roads and highways, but these *Acts* have in no way divested the Legislature of its jurisdiction, and it today, by general law or by special *Act*, with the *Constitutional* quantum of vote, can legislate concerning roads and highways.

And to what are we referred as indicative of the State

Highway Department being an executive rather than a legislative instrumentality?

▮ Not now speaking of the quantum of vote necessary to enact legislation affecting roads or highways, nor whether it need be by general or special acts, but purely of the power of control of highways as a legislative or executive function, we are furnished with no authority denying that such control is a legislative function. Highways are the arteries of a State and the Legislature has always governed the "laying out, alteration, maintenance or vacation" of these arteries. This control is often delegated through the instrumentality of local governmental subdivisions and, at times, as toll roads by private or quasi public corporations which have been created and governed by legislative acts. In the absence of constitutional limitation the Legislature by its own direct instrumentality, such as a State Highway Department, may control such highways. The *Delaware State Highway Act* charged the Department with the duty of acquiring full information of existing and necessary roads "with a view to establishing such a consistent, congruous, comprehensive and permanent system of State highways * * * as will accommodate the greatest needs of the people of the State." *Rev. Code* 1935, § 5722.

The *Act* charges the Department not only with the duty of laying out and constructing the highways, but to "maintain" them, and maintenance means not only the keeping in repair but also the continued existence of the highways as a system of roads for public use.

The Relator, however, in his brief, indicates the Highway Department is not solely concerned with roads and highways, but has jurisdiction over the State Police and Motor Vehicle Department. It is said in the brief that the Department has jurisdiction over the State Police who are "authorized, empowered and directed to suppress all acts

of violence and to enforce all Iaws relating to the safety of persons and property."

The full description of the duties of the State Police is found in *Sec.* 5747 of the *Revised Code* of 1935, as follows:

"The Department is authorized to appoint traffic officers whose primary duties shall be to compel the enforcement of all laws relating to the weight, speed and operation of vehicles on the public highways of the State. They shall be officially known and referred to as 'State Police.' * * *

"Traffic officers shall have police powers similar to those of sheriffs, constables and other police officers, and shall be conservators of the peace throughout the State, and they are hereby authorized, empowered and directed to suppress all acts of violence, and to enforce all laws relating to the safety of persons and property."

It is only under the designation as "traffic officers" that the State Police have the powers and duties quoted by the Relator, and the primary duties of the officers are, as set out in the Statute, to enforce traffic regulations on the highways of the State.

The Relator also draws our atteniton to the fact that a recent *Act* of the Legislature, effective April 11, 1939 (*Vol.* 42, *c.* 167), has placed the Motor Vehicle Department under the supervision and control of the State Highway Department. The duties of the Motor Vehicle Department, however, are in no way disassociated from the roads and highways of the State; its jurisdiction begins and ends in connection with the highways and the regulation of traffic thereon, and no jurisdiction otherwise exists.

The Relator has conceded the right of the Legislature to exercise the power of appointment to offices which are quasi-legislative in character. We are of the opinion that the State Highway Department is a legislative rather than an executive instrumentality, and consequently in the regulation of that Department we perceive

no constitutional invasion of the Executive's prerogatives. With the wisdom of the action we have nothing to do.

Not having found the statute, *Vol.* 42, *c.* 173, unconstitutional on any ground presented to us, then in accordance with the case stated judgment will be entered for the respondents for their costs.