KNIGHTS OF THE IRON HORSE *v.* CITY OF DETROIT.

1. MUNICIPAL CORPORATIONS—CONTRACTS—COMPETITIVE BIDS.
   Where a charter provision requiring competitive bidding for supplying materials or service for a city is mandatory, the municipality is not bound by contracts made in defiance thereof.

2. SAME—CONTRACTS—INJUNCTION—TRUCK RENTALS.
   .Alleged contracts between plaintiff truck owners and the department of public works for hauling rubbish of a city, which involved the expenditure of more than $500 and which were not let pursuant to mandatory provisions of city charter relative to competitive bidding, were invalid, hence plaintiffs were not entitled to injunction to restrain enforcement of resolution of common council subsequently reducing the schedule of rates for truck rental after plaintiffs had purchased new trucks, on ground of estoppel (Detroit City Charter, title 6, chap. 7, § 3).

Appeal from Wayne; Brennan (Vincent M.), J. Submitted January 8, 1941. (Docket No. 58, Calendar No. 41,208.) Decided February 11, 1942.

Bill by Knights of the Iron Horse, a corporation, and others against City of Detroit and others to restrain enforcement of a resolution adopted by the common council reducing rental of trucks employed by the city. Bill dismissed. Plaintiffs appeal. Affirmed.

*Edward N. Barnard,* for plaintiffs.

*Paul E. Krause,* Corporation Counsel, and *Clarence E. Page,* Assistant Corporation Counsel, for defendants.

STARR, J. On April 11, 1940, plaintiffs filed bill of complaint to enjoin defendants from putting into effect a resolution adopted by the common council of the city of Detroit, April 9, 1940. Such resolution reduced the rental of trucks, owned by the individual plaintiffs, and employed by the board of public works of the city of Detroit, from $17.50 to $14 per day. Plaintiffs appeal from decree dismissing their bill of complaint.

Plaintiff Knights of the Iron Horse is a nonprofit corporation whose members, including individual

plaintiffs and others, owned trucks which were employed by the department of public works for the hauling of garbage and rubbish. In 1938 the department of public works, with the approval of the common council of the city of Detroit, established a new schedule of truck rentals, as follows:

"For trucks of 10-yard capacity, new or less than three years old, $17.50 per day;
"Three to six years old, $16.50 per day;
"Over six years old, $14.50 per day;
"For trucks of 5-yard capacity, new or less than three years old, $11 per day;
"Over three years old, $9.50 per day."

Later in 1938 individual plaintiffs and other members of the Knights of the Iron Horse submitted the following written proposal to the commissioner of the department of public works:

"The members of this association having older trucks which come under the rate of $9.50 for the 5-yard job and $14.50 for the 10-yard job, feel that they cannot 'break even' with these trucks and are therefore desirous of purchasing new equipment so as to come under the higher rates. At the present time upwards of 75 of the members desire to do this. However, as you will readily appreciate these members will find it difficult, if not impossible, to meet credit requirements of manufacturers unless there be reasonable assurance of steady employment for the trucks.

"We therefore ask that your department give us assurance that the trucks so purchased will be furnished at least four days work per week for the three-year period required for making the payment."

In pursuance of such proposal the commissioner of the department, in a communication to the common council of the city, requested authority to make

30-month contracts with not more than 50 per cent. of the employed truck owners at a rental rate of $17.50 per day for trucks of 10-yard capacity, "so that they can purchase suitable equipment to match the present city-owned new equipment." On about November 15, 1938, the common council, pursuant to such request from the commissioner, adopted the following resolution:

"Resolved, that the department of public works be and it is hereby authorized and directed to enter into 30-month contracts with not more than 50 per cent. of the present employed truck owners in accordance with the foregoing communication."

Thereafter the department of public works prepared specifications and regulations regarding the height, color, and other requirements of new trucks to be purchased by plaintiffs. Plaintiffs alleged in their bill of complaint that they advertised for and received bids for the purchase of trucks meeting the specifications of the department and accepted a bid for the purchase of such trucks; that at the request of the department a demonstrator truck was procured and operated for two months; and that the department then approved the purchase of new trucks by plaintiffs. Plaintiffs alleged, in substance, that, in reliance upon the assurances of defendants that the new trucks would be employed for the 30-month period at the specified rental of $17.50 per day, plaintiffs purchased new trucks on a time-payment plan; that such new trucks were employed by the department of public works at the rental of $17.50 per day; and that the city, in setting up its budget for the fiscal year from July 1, 1939, to June 30, 1940, made provision for the payment of the agreed truck rental of $17.50 per day. In their bill of complaint plaintiffs also state that:

"In order to meet the finance requirements laid down by the department of public works, it was necessary to purchase these trucks upon a contract calling for payment in 30 months, that being a period of time far exceeding that normally given in the purchase of such equipment. Prior to the actual purchase of such trucks by plaintiffs, conferences and discussions were had between the then commissioner of public works and the then president of the common council of said city, representatives of plaintiffs, and representatives of the finance company which contemplated financing the purchase of this equipment, and in such conferences plaintiffs and the representatives of the finance company were assured by the then commissioner of public works and the then president of the common council, that if the trucks be so purchased by plaintiffs, the city would continue to rent the same from plaintiffs during the entire life of the 30-month purchase contract, and it was well known to the city of Detroit and the then commissioner of public works and the then president of the common council that plaintiffs would not purchase such trucks and that the finance company would not finance the purchase of the same unless such assurances could be given. In reliance upon such assurances, plaintiffs did make such purchases and the same were financed by the finance company, and plaintiffs have since such time used and operated the trucks so purchased by them in the service of the department of public works."

Plaintiffs alleged further that, notwithstanding the assurances of the department and the city that such new trucks would be employed for the 30-month period at the agreed rental of $17.50 per day, the common council, on April 9, 1940, adopted the following resolution:

"Resolved, That the department of public works be and it is hereby authorized and directed to con-

tinue the employing of 10-yard trucks for the hauling of rubbish at a rate of not to exceed $14 per day, and 6-yard trucks for the hauling of rubbish at a rate of not to exceed $10 per day, said employment to be on the basis of seniority rated by the date on which each truck was first employed by the city of Detroit.

"Provided, That the renting of trucks by the city of Detroit on this basis shall become effective immediately upon approval of this resolution, and shall cease on June 30, 1941."

Plaintiffs claimed that the action of the city in causing them to purchase new trucks by the assurance that such trucks would be regularly employed for a 30-month period at a rental of $17.50 per day, has "created an estoppel making it inequitable that the city of Detroit should * * * before the termination of said 30-month period, refuse to employ such trucks and to pay therefor the rental established by such resolution of the common council of November 15, 1938." Plaintiffs asked that defendants "be permanently enjoined from putting into effect the resolution of the common council of April 9, 1940," and from reducing the rental of plaintiffs' trucks below the price of $17.50 per day.

Defendants filed answer denying plaintiffs' right to the relief sought and alleged, *inter alia,* that no contract was executed or entered into in the manner prescribed by title 6, chap. 7, of the charter of the city of Detroit, which provided:

"Contracts to be let to lowest bidder:
"Sec. 3. No contract for the construction of any public building, sewer, paving, graveling, planking, macadamizing, nor for the construction of any public work whatever, nor for any work to be done, nor for purchasing or furnishing any material, printing or supplies for the city, if the expense of such construc-

tion, repairs, work, printing materials or supplies exceeds $500, shall be let or entered into except to and with the lowest responsible bidder, with adequate security. No contract involving an expenditure exceeding $500 shall be let until a notice calling for bids shall have been duly published in at least one daily paper published in the city, for such period as the common council shall prescribe. * * *

"Unauthorized contracts void:

"Sec. 6. All contracts hereafter made or entered into contrary to or not authorized by the provisions of this charter, shall be void."

The record indicates that at the trial little testimony was taken, it apparently being conceded by both parties that the issue was one of law and could be determined on the bill of complaint, answer, and documentary evidence admitted. The trial court's opinion stated, in part:

"After plaintiffs had introduced certain proofs and records, it was suggested by the court, because of the legal issues presented, that there was no necessity for prolonging the hearing. It was stipulated that all records, documents and correspondence which had been referred to by counsel for the plaintiffs should be considered a part of the record. The charter of the city of Detroit was admitted in evidence. For the purposes of this opinion it may be conceded that the facts (as distinguished from legal conclusions) stated in the bill of complaint are true.

"Plaintiffs do not claim that the city is bound by formal contract to pay the higher rate. In fact, it appears that, although the common council in November, 1938, authorized the department of public works to enter into contracts with '50 per cent. of the present employed truck drivers' at $17.50 per day, such contracts were never entered into by the department for the reason that they were declared by the corporation counsel to be invalid as violative

of title 6, chap. 7, § 3, of the charter, which requires competitive bids following advertising for the same on contracts involving expenditures in excess of $500. (This opinion, at the time it was rendered by the corporation counsel, was communicated to the plaintiffs' representative.)

"Plaintiffs, rather, base their claim upon a theory of estoppel, asserting that they, in reliance upon assurances given them by the commissioner of public works and other city officials, purchased a large number of motor trucks, of specifications indicated by the commissioner, and that they obligated themselves to an amount aggregating several hundreds of thousands of dollars in instalment payments for such trucks over a period of 30 months from date of purchase. Plaintiffs claim that the commissioner of public works at that time agreed that, if plaintiffs did purchase trucks of the specifications outlined by him, the city would rent such trucks at $17.50 per day for the 30-month period. (It should be noted that defendants deny these allegations, but, as stated above, the allegations, for the purpose of this opinion, may be considered as true.)

"Counsel for the plaintiffs argues that this claimed 'arrangement,' short of a contract, binds the city by way of estoppel, and urges, particularly, that, inasmuch as plaintiffs have obligated themselves by contracts to purchase trucks, the city is not in a position now to restore the *status quo* of the plaintiffs. * * *

"It seems clear to this court that, whether plaintiffs base their position on 'contract,' 'arrangement,' so-called 'moral obligation,' or 'estoppel' they are in no position to claim equitable relief against the city for the reason that the claimed official acts upon which they rely (the existence of which, of course, is denied by the city) were in direct violation of mandatory provisions of the city charter, were utterly void, and could give rise to no claim, legal or equitable, against the city. * * *

"Counsel complains that plaintiffs changed their *status quo* in reliance upon the assurances of city representatives, and that the city cannot now restore plaintiffs to their original position. It is conceded by plaintiffs that they have been paid in full for all services rendered by them before the rate of pay was reduced by the resolution of the common council on April 9, 1940. It is true that the plaintiffs have motor trucks on their hands, upon which large sums are due. But these trucks were purchased by them in the absence of any contract between them and the city, and after plaintiffs had been advised by the corporation counsel and by their own attorney (see Exhibit 20) that no such contract could legally be entered into, in view of the charter, unless competitive bids, following legal publication, were first made. For this court now to enforce plaintiffs' demands would be, in effect, to say that the 'arrangement' relied upon had the effect of a contract, although a contract to the same effect would have been illegal and void."

Decree dismissing plaintiffs' bill of complaint was entered May 15, 1940.

It is admitted that no contract was executed between plaintiffs and defendants for the employment of individual plaintiffs and new trucks to be purchased by them. It is also admitted there was no advertisement for bids in connection with the employment of plaintiffs and their trucks. The corporation counsel of the city had advised that the proposed contract between plaintiffs and the department of public works would be invalid under the provisions of the city charter (above quoted) requiring advertisement for bids in case of an expenditure involving more than $500. The president of the Knights of the Iron Horse was informed of the corporation counsel's opinion and advice.

Plaintiffs, conceding that no formal contract was executed and that the charter provisions were not

complied with, nevertheless contend that failure to comply with the charter provisions was a mere irregularity and that, under the circumstances, the city was estopped from denying the validity of the alleged contract. Plaintiffs' counsel states in his brief:

"As stated, the only reason the commissioner did not enter into formal contracts with plaintiffs was that he was advised by the corporation counsel that the charter provision required the prior advertising for bids because an expenditure of more than $500 was involved in the case of each truck. However, all the facts and circumstances as set forth in the bill of complaint show that there was a contract, though informal, entered into between the commissioner and plaintiffs. This action of the commissioner, in the absence of bids, was an irregularity; the power to contract was present, hence the contract was not *ultra vires*. The city should, therefore, now be estopped to take advantage of the technical requirement of the charter."

To sustain plaintiffs' contentions would result in enforcing a contract which was invalid, because it was not made in compliance with the mandatory charter provisions above quoted. To enforce the alleged contract under plaintiffs' theory of estoppel would require a complete disregarding of such charter provisions.

The rule is established in this State that a charter provision requiring competitive bidding is mandatory and that a municipality is not bound by contracts made in defiance of it. In the case of *City of Saginaw* v. *Consumers' Power Co.*, 213 Mich. 460, 479–481, Mr. Justice FELLOWS said:

"The charter of the city of Saginaw contains the following provision:

"'No contract for the expenditure by the city of a sum exceeding $250 for any purpose whatsoever,

shall be entered into unless the same shall be let upon competitive bids in the manner herein described.'

"The contract between the city and the power company for lights other than street lights and for power was not let at a competitive bidding and the facts set up in the bill and the records before us demonstrate that the contract required an expenditure by the city of more than $250 per month and a very large sum covering the period of the contract. Without such competitive bidding, could a valid contract be entered into between the power company and the city as a consumer? * * *

"Is the provision of the charter of the city of Saginaw now under consideration a mandatory or a directory provision? The provision requiring competitive bidding is one common to most municipal charters. It is a provision designed for the protection of the public. Speaking of such provisions, it is said in 20 Am. & Eng. Enc. Law (2d Ed.), p. 1165:

" 'The object of [all] such provisions is, it has been said, to "prevent favoritism, corruption, extravagance, and improvidence" in the awarding of municipal contracts, and they should be so administered and construed as fairly and reasonably to accomplish such purpose.'

"That a provision requiring competitive bidding is mandatory, that the municipality is not bound by contracts made in defiance of it, finds support in the great weight of authority and is in accordance with the holdings of this court. * * *

"The city was not, and is not, bound by its contract made with the power company without competitive bidding and in violation of the mandatory provision of its charter."

"The requirement of competitive bidding in the letting of municipal contracts is uniformly construed as mandatory and jurisdictional and nonobservance will render the contract void and unen-

forcible." 3 McQuillin on Municipal Corporations
(2d Ed.), p. 859, § 1287.

See, also, *Attorney General, ex rel. Allis-Chalmers
Co., v. Public Lighting Commission of Detroit,* 155
Mich. 207; *Mackey v. Township of Columbus,* 71
Mich. 227; *Stratton v. City of Detroit,* 246 Mich.
139; *Zottman v. City and County of San Francisco,*
20 Cal. 96 (81 Am. Dec. 96); *Richardson v. Grant
County,* 27 Fed. 495; *Brady v. Mayor, Aldermen
and Commonalty of the City of New York,* 16 How.
Prac. 432, affirmed 20 N. Y. 312; *Buchanan Bridge
Co. v. Campbell,* 60 Ohio St. 406 (54 N. E. 372);
*La France Fire-Engine Co. v. City of Syracuse,* 33
Misc. 516 (68 N. Y. Supp. 894); *Smeltzer v. Miller,*
125 Cal. 41 (57 Pac. 668); *Springfield Milling Co.
v. Lane County,* 5 Ore. 265; *Cawker v. Central Bit-
ulithic Paving Co.,* 140 Wis. 25 (121 N. W. 888).

The above-quoted charter provisions were not
directory, but were mandatory. The alleged con-
tract for employment of individual plaintiffs and
their trucks, which contract plaintiffs seek to en-
force, involved an expenditure, by defendants, of
more than $500. Such contract was invalid, because
it was not made in compliance with the charter pro-
visions. Such invalid contract cannot be given va-
lidity under plaintiffs' theory of estoppel. The com-
missioner of public works and the common council
of the city could not obligate the city on a contract
made in defiance of mandatory charter provisions.

In view of our conclusions, other questions do not
require consideration.

The decree of the trial court entered May 15, 1940,
is affirmed, with costs to defendants.

CHANDLER, C. J., and BOYLES, NORTH, BUTZEL,
BUSHNELL, and SHARPE, JJ., concurred. WIEST, J.,
did not sit.