Opinion of the Justices of the Supreme Court in Response to a Question Propounded by the Governor of Delaware pursuant to 29 *Del. C.,* § 2102.

(*January* 11, 1962.)

To His Excellency Elbert N. Carvel, Governor of Delaware:

Reference is made to your letter of September 6, 1961, addressed to the Chief Justice, requesting the opinion of the members of the Supreme Court upon the constitutionality of an "ACT CREATING AND CHARTERING THE DELAWARE INDUSTRIAL BUILDING COMMISSION, AUTHORIZING THE COMMISSION TO ISSUE BONDS AND PLEDGING THE CREDIT OF THE STATE THEREFOR", (53 *Laws*, Ch. 167), and also on the constitutionality of bonds issued pursuant to this act. Of course, the answer to the latter part of your question relating to the constitutionality of bonds to be issued will be the same as the answer to the question of the constitutionality of the act which authorizes their issue.

53 *Laws*, Ch. 167, was passed with the affirmative vote of three-fourths of all the members of the General Assembly elected to each House, and was approved by the Governor on August 18, 1961. The act amends 6 *Del. C.*, by adding a new Part IV entitled Commercial Development, and by adding a new Chapter 70 entitled Delaware Industrial Building Commission. By § 7001 certain legislative findings and a declaration of policy are made. In substance these are that the public welfare depends upon the steady employment of the State's citizens in useful occupations; that in certain agricultural areas of the State many citizens are employed sporadically or not at all; that such areas have increasingly limited opportunities for employment in agriculture; that the increasingly limited opportunity for employment in agriculture threatens the economic stability of the State and depresses

the standard of living of its citizens to the detriment of the public health and welfare, and that the creation of an Industrial Development Commission will permit the location of industrial enterprises in agricultural areas with the consequent elimination of areas of sporadic and chronic unemployment, all to the benefit of the public welfare.

The act, accordingly, creates an Industrial Building Commission with authority granted by § 7005 to certify private nonprofit corporations which meet the statutory standards as Certified Development Corporations, and with further authority granted by § 7003, when a project for the location of an industry in an unemployment area meets the standards required by that section, to pledge the credit of the State for the guaranty of the bonds of the Development Corporation proposing the project. The proceeds of the sale of the Development Corporation bonds are then to be used for the construction or acquisition of the physical structures and land of the project, which will then be leased or sold to the private industry thus induced to locate within the area.

Upon receipt of your letter and after a preliminary examination of the possible subordinate questions of law raised by your inquiry, the members of the Court were of the opinion, because of the far-reaching nature of those questions, that it was desirable to formulate an answer to your inquiry only after full briefing and oral argument of the possible questions.

Due to lack of funds, it was impossible to employ counsel for this purpose. Accordingly, at the request of the members of the Court, and despite the fact that ordinarily it is the duty of the Attorney General to uphold the constitutionality of acts of the General Assembly, the Honorable den of an attack on the act's constitutionality. Similarly, Ernest S. Wilson, Jr., Esquire, of the New Castle County

Bar, who represents private parties interested in upholding the act, agreed to accept the burden of upholding its constitutionality. Both of these gentlemen ably and forcefully presented their respective sides of the argument, all without cost to the State. We acknowledge our debt to them for their indispensable assistance.

So that our answer to your inquiry would be as complete as possible, the Attorney General conferred with the State's bonding attorneys and formulated several questions of law upon the answers to which the ultimate question of constitutionality depends. The argument before us was confined to these questions, and our answer to your question should therefore be considered as limited by these precise questions.

The questions thus formulated are as follows:

1. Does 53 *Laws*, Ch. 167, violate Article II, Section 16 of the Constitution for the reason that it contains subjects not expressed in its title?

2. Is 53 *Laws*, Ch. 167, an unconstitutional delegation by the General Assembly of the legislative powers to tax, appropriate, and borrow money and to lend the credit of the State to private persons in violation of Article I, Section 7, and Article VIII, Sections 1, 3, 4 and 6 of the Constitution of the State of Delaware?

3. Is 53 *Laws*, Ch. 167, unconstitutional because it is for a private purpose in violation of Article I, Section 7, and Article VIII, Sections 1, 3, 4 and 6 of the Constitution of the State of Delaware?

We will state our answers to these questions in the order in which they are set forth.

*Question No. 1*

Article II, Section 16, of the Constitution, *Del. C. Ann.* provides:

"No bill or joint resolution, except bills appropriating money for public purposes, shall embrace more than one subject, which shall be expressed in its title."

On many occasions the Courts of this State have had occasion to consider this provision of the Constitution. It would serve no purpose to review these decisions. Suffice it to say that it is now well settled that Article II, Section 16, does not require the title of a bill to be an index of its details, or a synopsis of the means by which the bill's object is to be accomplished. The requirements of the section are satisfied if the title of the bill is sufficiently informative so as to put on notice parties interested in the general subject matter in such manner as would lead them to inquire into it. *State ex rel. Morford v. Emerson*, 1 *Terry* 328, 10 *A.* 2d 515, aff'd 1 *Terry* 496, 14 *A.* 2d 378; *State ex rel. Craven v. Schorr*, 11 *Terry* 365, 131 *A.* 2d 158. The fundamental purpose of the section is to prohibit the passage of sleeper legislation.

The Attorney General argues that this title is defective because it does not give fair notice that the bill would authorize the Industrial Commission to issue bonds upon the credit of the State; to guarantee the bonds of private corporations; that the State's immunity to suit is waived, and that one section of the act amounts to an appropriation of public funds.

We are of the opinion, however, that the title of this act, indicating as it does the creation of an Industrial Commission with authority to issue bonds and pledge the credit of the State in support thereof, is notice to interested parties of such character as to require of them an inquiry into the body of the act. We do not think the title can fairly be described as designed to trap the unwary into inaction. All interested parties are put on notice that the bill would permit the pledging of the State's credit and the possible ultimate expenditure of public money.

We think 53 *Laws*, Ch. 167, is not unconstitutional as a violation of Article II, Section 16.

*Question No. 2*

The attack upon the act as an improper delegation of powers by the General Assembly to the Industrial Commission generally speaking is that the act confers upon the Commission the power to tax, appropriate money, to borrow money and to lend the credit of the State, all in violation of Article I, Section 7, and Article VIII, Sections 1, 3, 4 and 6 of the Constitution.

Article I, Section 7, is the so-called due process clause, or law of the land, of the State Constitution. Article VIII, Section 1, requires that all taxes shall be uniform upon the same class of subjects. Article VIII, Section 3, provides that no money shall be borrowed or public debt created except pursuant to an act of the General Assembly passed by a three-fourths majority of all the members. Article VIII, Section 4, prohibits the appropriation of public money to, the issuance of bonds to, or the pledging of the credit of the State to any private corporation other than pursuant to an act passed with a three-quarter majority of all the members of the General Assembly. Article VIII, Section 6, provides that no money may be drawn from the State Treasury but pursuant to an appropriation made by an act of the General Assembly.

The powers enumerated in the referred-to sections of Article VIII are vested in the General Assembly as legislative powers. This being so, it is axiomatic that the General Assembly may not delegate to any other agency authority to exercise those powers. *State ex rel. Morford v. Tatnall,* 2 *Terry* 273, 21 *A.* 2d 185; *Darling Apartment Co. v. Springer,* 25 *Del. Ch.* 98, 15 *A.* 2d 670.

The prohibition against the delegation of legislative powers, however, does not prevent the General Assembly enacting a law exercising one or more of these legislative

powers and at the same time conferring upon an administrative agency the authority to determine when the power exercised by the act shall be enforced. This is clear from the opinion in the *Tatnall* case where it is said:

"The maxim that power conferred upon the legislature to make laws cannot be delegated to any other authority does not preclude the legislature from delegating any power not legislative which it may itself rightfully exercise. It may confer an authority in relation to the execution of a law which may involve discretion, but such authority must be exercised under and in pursuance of the law. The legislature must declare the policy of the law and fix the legal principles which are to control in given cases; but an administrative officer or body may be invested with the power to ascertain the facts and conditions to which the policy and principles apply."

The precise question is, therefore, whether or not this particular General Assembly has delegated its powers to the Industrial Commission, or has merely delegated to the Commission authority in its discretion to determine facts and conditions which will bring into play the execution of the legislative power exercised by the act itself. If the latter is the case, then the law is valid provided the General Assembly has declared the policy of the law, and has fixed the legal principles and standards which are to control the Industrial Commission in the exercise of its discretion. We turn, therefore, to the act to determine whether or not this is the case.

By § 7003(a) the Industrial Commission is authorized to pledge the full faith and credit of the State to the guaranty of bonds issued by a development corporation certified by the Commission in accordance with § 7005. This authorization, however, is dependent upon findings made by the Industrial Commission pursuant to § 7003(a) (1-6) that the proposed project: (1) will be located in an area with substantial unemployment; (2) its buildings will be all-

purpose industrial buildings; (3) will be leased or sold to a financially responsible entity; (4) will yield sufficient income to amortize the bonds; (5) the prospective tenant or purchaser of the project will be obligated to purchase 5% of the bonds issued for the project, and (6) will accomplish the purposes of the act. By § 7003.(b) the Industrial Commission is prohibited from pledging the credit of the State in support of issues of bonds in excess of a total of $10,000,000, or in excess of a total of $2,000,000 for any one project.

We think that the referred-to provisions of the act do not amount to the delegation to the Industrial Commission of the legislative powers of creating debt or pledging the credit of the State conferred by Article VIII, Sections 3 and 4, exclusively upon the General Assembly. In compliance with those sections, the General Assembly by three-fourths majority vote has exercised those powers, but has conferred upon the Industrial Commission the authority to determine the facts and circumstances which will cause the legislative exercise of power to function. We are also of the opinion that a sufficient guide or yardstick for the exercise of its discretion has been furnished the Industrial Commission. It is only when the necessary facts have been determined by the Industrial Commission in accordance with that standard that the act, itself, pledges the credit of the State.

Next, the Attorney General argues that § 7006(d) is unconstitutional as a violation of Article VIII, Section 6, which provides that no money shall be drawn from the Treasury except pursuant to an appropriation act of the General Assembly.

The act in § 7006 provides certain remedies for bondholders in the event of default in the payments required to service the bond issue. *Inter alia*, the section authorizes the appointment of a Receiver by the Court of Chancery to take possession of the facilities and revenues of the development

corporation issuing the bonds and apply the revenues to the payment of the bonds in default.

In the event the revenues are insufficient for this purpose, the Receiver is then authorized by § 7006(d) to make demand upon the Industrial Commission which is thereupon directed to issue a warrant to the State Treasurer in the amount of the deficiency. The Treasurer is thereupon directed to pay the warrant out of funds "not otherwise appropriated or out of funds provided by the General Assembly for this purpose."

We are of the opinion that the direction to the State Treasurer to pay the warrant out of funds "not otherwise appropriated", which we take to mean the General Fund of the State, is in violation of Article VIII, Section 6, for the reason that it would constitute a withdrawal of funds from the Treasury otherwise than by an appropriation act. To this extent § 7006(d) is therefore unconstitutional.

The Attorney General also argues that the authorization granted the Industrial Commission by § 7003(c) (9) "without limitation of the foregoing to borrow money," etc., and § 7003(c) (10) to pledge its revenue as security for obligations are violations of Article VIII, Section 3, which prohibits the borrowing of money by the State except by act of the General Assembly passed by a three-fourths majority of all the members.

These two subsections are described as in effect giving the Industrial Commission a "blank check" on the State's Treasury for the reason, it is argued, that there is no specified limit upon the borrowing capacity thus granted. Thus, it is argued, the State's credit may be pledged by the Industrial Commission to an unlimited extent which is clearly an unconstitutional delegation of legislative power.

In answer to this argument, the proponents of the statute say that § 7003(c) is a grant of powers to the Industrial Commission which do not involve or permit pledging the credit of

the State. It is pointed out that the powers conferred by this section are substantially the same powers granted to Municipal Parking Authorities by 22 *Del. C.* § 504, and in effect afford the Industrial Commission an alternative method of financing by the pledge as security of the assets or revenues of the Commission. In other words, it is the equivalent of financing by revenue bonds not guaranteed by the State.

We must admit that neither construction of § 7003 (c) is so clear as to admit of no doubt. When, however, two constructions of a statute are possible and one of them is unconstitutional, the courts are bound to accept the one which is constitutional. Therefore, we are constrained to adopt the construction urged by the proponents of the statute which maintains its constitutionality.

We hold, therefore, that § 7003(c) is properly construed to mean that the powers granted therein do not include the power to pledge the credit of the State in violation of Article VIII, Section 3. So construed, we think the section is constitutional.

Next, it is argued that § 7004(c) authorizing a Certified Development Corporation to enter into agreements securing its bonds and to "pledge the credit of the State as hereinbefore limited" is a clearly improper delegation to a private corporation of the power to pledge the credit of the State in violation of Article VIII, Section 4.

We think that the argument overlooks the significance of the phrase "as hereinbefore limited". The phrase clearly refers to the power granted the Industrial Commission by § 7003(a) and (b) after a proper factual finding to determine that the proper conditions exist for the pledge, by 53 *Laws,* Ch. 167, of the credit of the State. The complained of provision in § 7004 (c) is nothing more than a provision for the mechanics of carrying into effect the provisions of the law. It is not a grant of power to the Development Corporation.

That corporation may act only after the Industrial Commission has acted. There may be difficulties of a practical nature in carrying this provision out, but those difficulties do not affect the answer to the constitutional question.

The Attorney General argues that the statute is an improper delegation of powers by reason of Article I, Section 8, the equivalent in our Constitution of the Federal Due Process Clause. The argument, however, is not developed in the briefs and, in any event, the foregoing is its answer.

In conclusion, therefore, under this question, we are of the opinion that 53 *Laws,* Ch. 167, is not unconstitutional as an improper delegation of legislative powers, subject to the proviso that the Industrial Commission is not authorized in borrowing money or securing loans pursuant to the powers granted by § 7003(c) to pledge the credit of the State, and subject to the further proviso that the authority purported to be conferred upon the Industrial Commission by § 7006(d) to issue a warrant to be paid by the State Treasurer is unconstitutional.

It is suggested that the provisions of the act are not severable and that, since some provisions are invalid, the entire act must be declared void. We think, however, that not to be the case. Not only does § 7009 specifically make the provisions of the act severable, but we think that the limited portion we have found to be unconstitutional is clearly severable. What effect this severance will have upon the workability of the statute is not before us.

### Question No. 3

Under this question the attack upon the constitutionality of the act is based upon the fundamental proposition that under our Constitution public money may be spent, or the public credit lent only when the purpose or object to be achieved is a public one. This raises for consideration, there-

fore, the general question of whether or not 53 *Laws,* Ch. 167, has as its objective a public or a private purpose.

The Attorney General argues that this limitation attaches to all expenditures of public money, or the lending of the public credit. The proponents of the act, however, argue that while Article VIII, Section 8, puts this limitation upon any county, city, town or other municipality upon the lending of its credit, or the expenditure of its money, the same limitation is not imposed with respect to the State because of Article VIII, Section 4, which authorizes the General Assembly to spend public money for a purely private purpose by a three-fourths vote of all the members of the General Assembly. In any event, argue the proponents, 53 *Laws,* Ch. 167, seeks to accomplish a public purpose, so that it is valid under either theory.

We inquire first whether the obligations to be assumed by the State under the act are for a public purpose. For the purposes of this inquiry we will assume that the effect of Article VIII, Sections 1, 3 and 4 require that the expenditure of the public money and the lending of the credit of the State, which includes the guaranty by the State of bonds of others, is invalid unless the act of the State in so doing is accomplishing a public purpose. If the existence of a public purpose is a prerequisite to the validity of such State action, then the absence of such a purpose would make the proposed act a violation of Article I, Section 7, of the Delaware Constitution and of the Due Process Clause of the Federal Constitution. 43 *Am. Jur.,* Public Securities and Obligations, § 17.

In *Wilmington Parking Authority v. Ranken,* 34 *Del. Ch.* 439, 105 *A.* 2d 614, we pointed out that the phrase "public purpose" is not capable of precise definition, and that as changing conditions create changing public needs, so also the concept of what is a public purpose changes. Accordingly, we held in that case that the furnishing of off-street parking in the light of modern traffic conditions may properly be held

to be a "public purpose", particularly in the light of the legislative findings to that effect.

There is no universal test which can be applied to every act to determine whether or not it is for a public purpose. Each case must be decided in the light of its particular facts and circumstances. *Aetna Casualty and Surety Co. v. Smith, Del.,* 131 *A.* 2d 168. Nor does the fact that the accomplishment of the public purpose will also confer an incidental benefit to private interests invalidate the act. *Wilmington Parking Authority v. Ranken, supra.*

In *Randolph v. Wilmington Housing Authority, Del.,* 139 *A.* 2d 476, this court upheld the constitutionality of an act permitting the use of the power of eminent domain to acquire property to be resold to private developers on the ground that the act's primary purpose was the elimination of slums, an admittedly public purpose, and that the ultimate transfer of the property to private ownership was a mere incident to the carrying out of the public purpose. Again, in the *Randolph* case, this court stated that "public purpose" was not susceptible of precise definition by rigid rule, but must in each case be determined with reference to the object sought to be accomplished and to the degree in which that object affects the public welfare.

In 53 *Laws,* Ch. 167, there are certain legislative findings and declarations as to the object sought to be accomplished by the act. This object is specifically declared to be a public purpose. It is, of course, true that legislative findings of public purpose are not conclusive on the courts, since the determination of what is a public purpose must of necessity ultimately be a judicial question. But such findings of public purpose are, however, entitled to great weight. Particularly is this so when the legislative findings are manifestly reasonable. *Wilmington Parking Authority v. Ranken, supra.*

What are the legislative findings before us? First, the welfare of the State depends upon the steady employment of its citizens. Second, in certain agricultural areas of the State more efficient farming methods are resulting in increasing unemployment of citizens formerly employed in agriculture, with only very limited opportunity for other employment. Third, sporadic or non-existent employment opportunities in such areas adversely affect the public welfare. Fourth, useful employment can be made available to those citizens by the establishment of commercial and industrial enterprises in the affected areas. We cannot say that these findings are unreasonable; on the contrary they seem manifestly reasonable. In the light of modern conditions everyone knows that chronic unemployment is a festering sore in the side of the State. We accept, as we must, these reasonable findings as establishing the existence of an evil properly the subject of State action for remedy.

We think, however, that the attack upon the act before us as not subserving a public purpose is directed to the method adopted by the General Assembly to remedy this evil rather than as to the existence of an evil to be remedied. The method adopted is to lend the State's credit to aid private industry in the establishment of itself in the affected areas. The argument is that the method adopted is a violation of the constitutional requirement that public money or credit be used only for a public purpose because, it is argued, it is to be used primarily for the benefit of private enterprises.

The General Assembly, however, has declared specifically that the establishment of an Industrial Building Commission with the described powers is a proper method for the remedying of an admitted evil. When such is the case, the test of constitutionality is whether the method adopted bears a reasonable relation to the public welfare, and in applying that test all doubts are to be resolved in favor of the

constitutionality of the act. *Wilmington Parking Authority v. Ranken, supra.*

We see little difference in principle between the use of the State's power of eminent domain to eliminate a slum by taking property from one private owner and turning it over to another for presumably non-slum uses, and the use of the State's credit to establish industry in an area of chronic unemployment in order to eliminate that economic evil. In the case of the elimination of the slum area, the State's money is used and that use ultimately benefits private interests. In the case of the elimination of unemployment, the State's credit is used and that use likewise ultimately benefits private interests. In both cases a public evil has been eliminated, theoretically at least, and in both cases likewise private interests have benefited. If one is constitutionally valid, it is impossible to say the other is invalid. In both cases, a public purpose has been accomplished.

We recognize, of course, that there could well be a difference of opinion as to whether or not the method adopted by 53 *Laws*, Ch. 167, was good or bad. Indeed, the same was true with respect to the methods approved in *Wilmington Parking Authority v. Ranken, supra,* and *Randolph v. Wilmington Housing Authority, supra,* by a divided court in each instance. Reasonable difference of opinion, however, as to the means to be employed to accomplish a public purpose is a matter to be resolved by the legislative rather than the judicial branch of Government. In the case of differences of opinion, the Courts are bound by the Legislature's findings. Furthermore, on this question, all doubts are to be resolved in favor of the constitutionality of the challenged act. *State v. Hobson,* 7 *Terry* 381, 83 *A.* 2d 846. And see the conclusion of the commentator in 59 *Columbia L. Rev.* 618, 647.

This Court has recognized the rule that, broadly speaking, the question resolves itself into a determination of whether or not the public purpose to be subserved is the primary or

dominant purpose of the act. If it is, then the act is one for a public purpose and the fact that an incidental result will be benefit to private interests does not invalidate it. On the other hand, if the primary object is private in nature, or for some purpose other than protecting the public welfare, such as the raising of revenue only, *McClelland v. Mayor & Council of Wilmington, Del. Ch.*, 159 A. 2d 596, the act is unconstitutional since the State may not use its powers to compete *per se* with private business. *Wilmington Parking Authority v. Ranken, supra.*

We think the primary purpose of 53 *Laws*, Ch. 167, is the removal of areas of unemployment in the State, an admittedly public purpose, and that the consequent benefit resulting to private interests is purely incidental to the method selected to remedy the evil. We are, therefore, of the opinion that the act is not unconstitutional because it is for a private purpose.

We note that by § 7001(d) of the act the General Assembly finds that more than half of the States of the Union have enacted legislation creating Industrial Development Authorities which in those States have served the public purpose intended. We accept this finding in the absence of any indication to the contrary. It is, of course, not binding upon the question presented, but it certainly demonstrates that the method selected is reasonably related to the public purpose of the act.

Recent decisions in other jurisdictions, we think, demonstrate a growing tendency on the part of legislatures and courts to expand the concept of public purpose beyond the narrow limits represented by the earlier decisions relied on by the Attorney General. See *McConnell v. City of Lebanon*, 203 *Tenn.* 498, 314 *S. W.* 2d 12; *Opinion to the Governor*, 88 *R. I.* 202, 145 A. 2d 87; *City of Frostburg v. Jenkins*, 215 *Md.* 9, 136 A. 2d. 852; *Opinion of the Justices*, 103 *N. H.* 258; 169 A. 2d 634; *Miller v. Police Jury of Washington Par-*

*ish*, 226 *La.* 8, 74 *S.* 2d 394. We think *Wilmington Parking Authority v. Ranken, supra,* and *Randolph v. Wilmington Housing Authority, supra,* place Delaware among those jurisdictions in which the concept is expanding. Opinions may differ as to the desirability of this constant expansion as a matter of public policy, but that question is to be resolved by the General Assembly, not by the courts.

Since we have found 53 *Laws*, Ch. 167, to be an act to accomplish a dominant public purpose, it is unnecessary for us to consider the argument made by the proponents of the act to the effect that Article VIII, Section 4, permits the appropriation of public money, or the loan of the public credit to a private interest when it is done by act of the General Assembly, passed with the concurrence of three-fourths of all the members elected to each House. The argument is based on the history of the guaranty by the State of railroad bonds prior to 1897, and the Debates in the Constitutional Convention of 1897 indicating that there was no intention to absolutely prohibit that practice but merely to make it more difficult. See *II Constitutional Debates*, 1418-1422, 1529, 1563-1565. We point out, however, that assistance to railroads and the furnishing of public transportation might well be a "public purpose".

By reason of all of the foregoing, our considered answer to the question propounded to us is that 53 *Laws*, Ch. 167, is a constitutional enactment of the General Assembly excepting the provision of § 7006(d) authorizing the Industrial Commission to issue a warrant to the State Treasurer and directing him to pay, which is unconstitutional, and further excepting that the Industrial Commission in the exercise of any powers conferred upon it by § 7003(c) may not pledge the credit of the State.

We call attention to the fact that in answering your general questions as to the constitutionality of 53 *Laws*, Ch. 167, we have given consideration only to the underlying

questions presented to us by counsel. Our answer to your question is thereby accordingly limited by those questions. We have not considered and have expressed no opinion upon other questions of a non-constitutional nature which may or may not arise in the course of operating under the act.

Respectfully submitted,

s/ CLARENCE A. SOUTHERLAND
Chief Justice

s/ DANIEL F. WOLCOTT
Associate Justice

s/ WM. DUFFY
Judge.