**OPINION OF THE JUSTICES of the Supreme Court in Response to a Question Propounded by the Governor of Delaware.**

Supreme Court of Delaware.

April 12, 1976.

To His Excellency Sherman W. Tribbitt, Governor of Delaware.

Reference is made to your letter dated April 5, 1976, received April 6, which contains the following request for the opinions of the Justices of the Supreme Court under 10 Del.C. § 141:[1]

"Article III, Section 18, of the Constitution (1897) of Delaware, reads in pertinent part as follows:

'Every bill which shall have passed both Houses of the General Assembly shall, before it becomes law, be presented to the Governor; if he approves, he shall sign it; but if he shall not approve, he shall return it with his objections to the House in which it shall have originated, . . . [I]f any bill shall not be returned by the Governor within ten days, Sundays excepted, after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, . . . .'.

"Article VIII, Section 3, of the Constitution (1897) of Delaware, reads as follows:

'No money shall be borrowed or debt created by or on behalf of the State but pursuant to an Act of the General Assembly, passed with the concurrence of three fourths of all the members elected to each House, except to supply casual deficiencies of revenue, repel invasion, suppress insurrection, defend the State in war, or pay existing debts; and any law authorizing the borrowing of money by or on behalf of the State shall specify the purpose for which the money is to be borrowed, and the money so borrowed shall be used exclusively for such purpose; but should the money so borrowed or any part thereof be left after the abandonment of such purpose or the accomplishment thereof, such money, or the surplus thereof, may be disposed of according to law.'

"There has recently been presented to me for my approval, a bill authorizing the State of Delaware to borrow money

1. 10 Del.C. § 141 provides in part:
   "The Justices of the Supreme Court, whenever the Governor of this State may require it for public information, or to enable him to discharge the duties of his office with fidelity, may give him their opinions in writing touching the proper construction of any provision in the Constitution of this State, or of the United States, or the constitutionality of any law enacted by the General Assembly of this State . . . ."

and to issue bonds and notes therefore and appropriating the funds thus obtained to the purchase of preferred stock of the Farmers Bank of the State of Delaware.

"Additionally, two bills authorizing funds from the Capital Investment Fund and the State Bond Reversion Accounts were approved by the General Assembly to purchase additional Farmers Bank stock.

"It would appear obvious, from a reading of the bills themselves (House Bill No. 938, House Bill No. 940 and House Bill No. 941), hereby attached, that it is the General Assembly's determination that it is a proper public purpose for using the funds obtained thusly for the purchase of Farmers Bank stock; however, since there may be a question in this regard, pursuant to 10 Delaware Code § 141 and 29 Delaware Code § 2102, I request your opinion as to the constitutionality of using the funds obtained through House Bills No. 938, 940 and 941 for the purchase of an issue of voting preferred stock of the Farmers Bank of the State of Delaware."

■ It is our understanding that you have not signed the Bills and thus the opinions requested have a bearing upon a present constitutional duty awaiting performance by the Executive, *In re Opinions of the Justices*, 18 Terry 117, 88 A.2d 128 (1952), that is, to approve or not approve, or to ignore the Bills. Art. III § 18. And since the inquiry implicitly concerns the constitutionality of the borrowing Bill, we conclude that the request comes within the purview of 10 Del.C. § 141.

You did not specifically state the time period available for consideration of the Bills but it is apparent that the ten-day constitutional period, Art. III § 18, began to run about April 5. Since time is thus

of the essence, we have undertaken to provide the opinions promptly without awaiting the assistance of counsel.

A copy of H.B. 938 which authorizes the issue of General Obligation Bonds in the amount of $15,000,000 is attached as an Appendix to these opinions. The funds borrowed will be used to purchase a "voting preferred issue of stock in the Farmers Bank of the State of Delaware." H.B. 940 appropriates $3,685,000 from the Bond Reversion Accounts for the same purpose after announcing a public policy and making Legislative findings substantially identical to those in H.B. 938. H.B. 941 appropriates $1,315,000 for the same purpose from funds initially authorized for the Advanced Acquisition Fund, 29 Del.C. § 9130, for the purchase of 131,500 shares of Farmers Bank preferred stock.

We focus first upon the provisions of Art. VIII § 3 of the Constitution which states:

"No money shall be borrowed . . . but pursuant to an Act of the General Assembly, passed with the concurrence of three fourths of all the members elected to each House, except to supply casual deficiencies of revenue, repel invasion . . . [and other specified purposes]."

This provision is substantially unchanged from the form in which it was approved in 1897. And it was the subject of significant inquiry and debate during the Convention which adopted the Constitution. See *Constitutional Debates* Vol. 2, pp. 1415–1416, 1487–1496 and 1520–1527. It was first proposed to the Convention that all borrowing be limited to certain enumerated purposes such as to supply casual deficiencies in revenue, to repel invasions, to defend the State in war, and so on. But, led by William C. Spruance and drawing on a recent catastrophe in Pennsylvania,[2] the Con-

---

2. Pennsylvania apparently had a Constitutional provision similar to that proposed to the Delaware Convention and when a fire destroyed its State House, the Legislature was handicapped in dealing with the emergency because borrowing to build was not a permissible purpose. How Pennsylvania resolved that dilemma is no part of our present inquiry.

vention concluded that State borrowing should not be limited to specific purposes. It seems obvious that the Convention deemed more flexibility desirable. And a measure of control was achieved not by limiting the purposes of any borrowing but by the introduction of voting requirements, that is, "the concurrence of three fourths of all the members elected to each House" is required for any borrowing other than for enumerated purposes. . See the discussion begun by Nathan Pratt on behalf of the Committee, *Debates* supra p. 1487.

■ The evolution of Art. VIII § 3 in the Convention debates provides a certain guide to what the provision means. In our opinions, it means this: money may be borrowed or a debt may be created on behalf of the State by simple majority vote of each House when it is done for one of the enumerated purposes; for all other purposes the concurrence of the members elected to each House is required. Since the purchase of stock by the State is not one of the stated purposes in Art. VIII § 3, it follows that a three fourths approval by each House was required. It is

our understanding that the Bills in question were all so approved and thus the constitutional voting requirements have been met.

■ Art. VIII § 3 also requires that any act "authorizing the borrowing of money . . . shall specify the purpose for which the money is to be borrowed." In our opinions H.B. 938 clearly specifies the purpose for which borrowing is authorized and, in that respect, complies with the second requirement of that constitutional provision.[3]

We turn now to that part of Your Excellency's request in which you ask for our opinions as to whether use of the funds is for a proper "public purpose."

■ We first observe that Art. VIII § 3 does not refer to a "public purpose" in so many words. But the issue of public bonds to be paid for by public funds raised by the process of taxation must be for a public purpose. 64 *Am.Jur.*2d § 94 Public Securities and Obligations. Hence, we assume that the effect of Art. VIII §§ 1, 3 and 4[4] is that borrowing of moneys

3. We are not informed as to the origin of the monies appropriated by H.B. 940 and H.B. 941 so we have not considered any limitation on the use of those funds which may be imposed by Art. VII § 3.

4. Art. VIII §§ 1 and 4 provide:
"Section 1. All taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws passed by the General Assembly. County Council of New Castle County and the ʳevy Courts of Kent and Sussex Counties ᵣe hereby authorized to exempt from coun  taxation such property in their respective counties as in their opinion will best promote the public welfare. The county property tax exemption power created by this section shall be exclusive as to such property as is located within the

respective counties. With respect to real property located within the boundaries of any incorporated municipality, the authority to exempt such property from municipal property tax shall be exercised by the respective, incorporated municipality, when in the opinion of said municipality it will best promote the public welfare."

"Section 4. No appropriation of the public money shall be made to, nor the bonds of this State be issued or loaned to any county, municipality or corporation, nor shall the credit of the State, by the guarantee or the endorsement of the bonds or other undertakings of any county, municipality or corporation, be pledged otherwise than pursuant to an Act of the General Assembly, passed with the concurrence of three fourths of all the members elected to each House."

upon the credit of the State and expenditure of the proceeds is invalid unless it is done for a public purpose. Compare *In re Opinion of the Justices*, 4 Storey 366, 177 A.2d 205 (1962).

■ In *Wilmington Parking Authority v. Ranken*, 34 Del.Ch. 439, 105 A.2d 614 (1954), the Supreme Court noted that the "phrase 'public' purpose is not susceptible of precise definition, and it is not possible to adopt any rigid rule by which to determine whether a purpose or use is to be held public or private." In brief, there is no universal test by which to measure whether a stated purpose is "public" or not. Each case must be decided in light of the particular facts and circumstances.[5] *Opinion* supra at 177 A.2d 212; 64 *Am.Jur.* 2d supra § 96.

■ The test of the validity of an act requiring the use of public monies is whether the act is designed to promote the public interest as opposed to the furtherance of advantage to individuals. *Green v. Frazier*, 253 U.S. 233, 40 S.Ct. 499, 64 L.Ed. 878 (1920); 81 *C.J.S.* States § 133. The fact that the accomplishment of the public purpose will also confer an incidental benefit to private interests does not invalidate an act. *Opinion* supra at 177 A.2d 214; *Wilmington Parking Authority v. Ranken* supra.

Here, the stated findings by the General Assembly in H.B. 938 and H.B. 940 are that:

(1) "[T]he good order and financial wellbeing of the State of Delaware and the welfare of its citizens depends on the continued existence of the Farmers Bank, . . . "; and

(2) The State presently owns 49.3% of the Bank's outstanding capital stock and "maintains substantial deposits" therein which are unsecured; and

(3) There has been a "substantial adverse change in the financial condition" of the Bank which "jeopardizes the good order and financial well-being and the welfare of the State."

■ Under settled law Legislative findings of public purpose are not conclusive on the Courts since the ultimate determination of what is a public purpose must, of necessity, be a judicial decision. *Opinion* supra at 177 A.2d 212. But such findings are of great weight, particularly when they are manifestly reasonable. *Wilmington Parking Authority v. Ranken* supra.

■ We take judicial notice of the financial difficulties of the Farmers Bank which is a matter of public knowledge and concern. And the State's special relationship to the Bank as stockholder, depositor and designator of nine directors is information equally in the public domain. As to the Bank's troubles, some of these, taken from a current Proxy Statement, are set out in the footnote;[6] we need catalogue no more.

---

5. In recent years Legislatures and Courts have expanded the "public purpose" concept beyond the narrow limits reflected by earlier cases. *Opinion* supra at 177 A.2d 214. See the discussion in Schwartz, *The Powers of Government* Vol. I, p. 160.

6. A Proxy Statement prepared by the Bank in preparation for a Special Meeting of Stockholders on April 16, 1976 contains certain information about its condition, including the following:
   "One of the principal causes for the current financial distress of the Bank is the material loss by the Bank in its loan portfolio during its fiscal year ended December 31, 1975. As a result of this and other factors, the Bank's loss for 1975 was $20.8 million, and its stockholders' equity was reduced by $21.3 million to approximately $1.2 million. It is estimated, based on preliminary data, that after the first quarter of 1976, stockholders' equity may be further reduced to approximately $500,000, because of losses incurred in such period. . . . The public announcements of the Bank's financial difficulties during January and February 1976 also

The State names nine of twenty-seven directors, *Opinion of the Justices*, Del.Supr., 352 A.2d 406 (2/17/76), and by statute all General Fund monies are deposited daily in the Bank. 29 Del.C. § 6103; *Opinion of the Justices*, Del.Supr., 358 A.2d 701 (3/9/76). Given the "unsecured" character of the "substantial deposits" (General Fund monies) by the State and the other relationships, we have no hesitancy in concluding that the Legislative findings are reasonable and that the Bills declare a valid public purpose. The fact that a portion of the Bank's capital stock is in the hands of private individuals in no way subordinates the public purpose. Compare *Opinion* supra at 177 A.2d 214.

Our conclusion is supported, we think, by *Green v. Frazier* supra in which the United States Supreme Court determined that the Due Process Clause did not prohibit North Dakota from issuing bonds, on the full faith and credit of the State, to secure funds for a bank owned and operated by that State. The Court noted and accepted the ruling by the highest court of North Dakota that the purposes of the Acts in question were of a "public nature and within the taxing authority." There are, of course, differences between full and partial ownership but there is a significant similarity between what North Dakota did and what Delaware proposes to do as to purpose (funding a bank), source of the funds (borrowing on bonds) and repayment thereof (by general taxation).

In giving you our opinions as to the Bills we, of course, make no judgment about the wisdom of what the General Assembly has done, nor are we concerned with alternative routes to the same goals. Our inquiry has been directed only to the method adopted by the Assembly to protect public assets (to "remedy an admitted evil" is the phraseology in earlier opinions; see *Opinion* at 177 A.2d 213; *Wilmington Parking Authority v. Ranken* supra), and as to that, we find no constitutional objection for the reasons stated.

The foregoing is the opinion of both Justices who sign this letter. The Chief Justice has disqualified himself from rendering an opinion on the subject about which you inquire.

Respectfully submitted,

WILLIAM DUFFY

JOHN J. McNEILLY
Justices

---

have had a materially adverse effect on the Bank's day-to-day business and its reduced equity has forced it to curtail its commercial banking business. There have been other adverse effects as well, including a substantial decrease in deposits. . . ."

The Statement describes an "Assistance Plan which has been worked out among your Bank, the State of Delaware and the Federal Deposit Insurance Corporation." The "principal features" of the Plan are:

"(1) An investment by the State of Delaware of $20 million in a new class of preferred stock to be authorized by the amendment.

(2) The purchase by the Federal Deposit Insurance Corporation for $32 million of certain sub-standard loans and other assets, owned by the Bank, and carried on the Bank's books at $40 million.

(3) The eventual payment to the FDIC by the bank of a maximum of $8 million for losses which may be sustained by the FDIC in connection with loans and assets purchased from the Bank.

(4) The State will continue to use the Bank as its sole depository and will maintain an average demand deposit balance of $40 million until the Federal Deposit Insurance Corporation has been repaid such losses.

(5) Increased supervision by the Federal Deposit Insurance Corporation of the Bank's policies and management.

(6) Transfer of effective control of the Bank to its principle investor, the State of Delaware.

(7) Prohibition of payment by the Bank of dividends to common stockholders without the consent of the Federal Deposit Insurance Corporation until it has been repaid, and further dividend restrictions pending redemption of the State's preferred stock."

APPENDIX

Reps: Jonkiert, McGinnis, Harrington, Derrickson, Sincock

SPONSOR _____

COMMITTEE _____

**HOUSE OF REPRESENTATIVES**

**128TH GENERAL ASSEMBLY**

**SECOND SESSION - 1976**

**HOUSE BILL NO.** _____

AN ACT AUTHORIZING THE STATE OF DELAWARE TO BORROW MONEY AND TO ISSUE BONDS AND NOTES THEREFOR AND APPROPRIATE THE FUNDS THUS OBTAINED TO THE PURCHASE OF PREFERRED STOCK OF THE FARMERS BANK OF THE STATE OF DELAWARE

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE (THREE-FOURTHS OF ALL MEMBERS ELECTED TO EACH HOUSE THEREOF CONCURRING THEREIN):

Section 1. It is hereby determined and declared to be the policy of the State of Delaware to protect the welfare, good order and financial well-being of the State and the citizens thereof and it is hereby further determined and declared as a matter of legislative finding that (1) the good order and financial well-being of the State of Delaware and the welfare of its citizens depends on the continued existence of the Farmers Bank of the State of Delaware as a viable ongoing and independent institution; (2) that the State of Delaware owns 49.3% of the outstanding capital stock of said Bank and that the State maintains substantial deposits in said Bank which are unsecured; and (3) that there has been a substantial adverse change in the financial condition of said Bank which jeopardizes the good order and financial well-being and the welfare of the State and its citizens and in furtherance of the policy herein set forth it is deemed advisable and necessary to authorize the Issuing Officers of the State (as such term is defined in Chapter 74, Title 29, Delaware Code) to borrow moneys for the sole purpose to purchase 1,500,000 shares of a voting preferred issue of stock in the Farmers Bank of the State of Delaware. The dividends paid upon the preferred stock purchased hereby or the interest paid if such stock is converted to notes shall be credited by the State against the debt service and principal redemption of the General Obligation Bonds or Bond Anticipation Notes issued to purchase such preferred stock.

Section 2. There is hereby appropriated to the State Treasurer of the State of Delaware the sum of Fifteen Million Dollars ($15,000,000) or so much thereof as may be necessary for carrying out the purposes of this Act, which money shall be expended for the purchase of the preferred stock of

the Farmers Bank of the State of Delaware.

Section 3. The sum of Fifteen Million Dollars ($15,000,000) or so much thereof as may be necessary for carrying out the purposes of this Act shall be borrowed by the issuance of bonds and bond anticipation notes upon the full faith and credit of the State of Delaware. Such bonds and notes shall be issued in accordance with the provisions of Subchapter I, but not Subchapter II of Chapter 74, Title 29, Delaware Code, where applicable, except that notwithstanding the provisions of such chapters, the bonds may, in the discretion of the Issuing Officers be term bonds to mature twenty years from the date thereof, shall bear interest at such rate or rates as may be determined by the Issuing Officers upon sale thereof, may be sold by the Issuing Officers at either public or private sale and shall not be subject to or included within any statutory or constitutional debt limitation otherwise imposed upon the issuance of obligations of the State of Delaware.

Section 4. There is hereby appropriated from the General Fund of the State of Delaware such sums as may be necessary for the expenses incident to the issuance of bonds and notes herein authorized, and such further sums as may be necessary to pay any interest which becomes due on such bonds and notes during the current fiscal year and such further sums as may be necessary for the repayment of the principal of any of the said bonds which become due during the current fiscal year. Vouchers for the payment of the expenses incident to the issuance of bonds and notes and for the interest and repayment of said bonds and notes shall be signed by the Secretary of State by and with the approval of the Issuing Officers. Any funds received from the premium and accrued interest on the sale of said bonds shall be deposited to the credit of the General Fund.

Section 5. The Budget Appropriation Bill which shall be enacted and approved by the General Assembly for the fiscal year next following the effective date of this Act and for each subsequent fiscal year or biennium, shall contain under the Debt ,Service Appropriation provisions for the payment of interest on any bonds and notes and principal maturities of the bonds (or notes which are not to be funded by the issuance of bonds) issued under the authority of this Act, and such of the revenues of the State of Delaware as are not prohibited by Constitutional provisions or committed by preceding statutes for other purposes are hereby pledged for the redemption and cancellation of said bonds and notes and payment of interest thereon.

### SYNOPSIS

This Act authorizes General Obligation Bonds in the amount of $15 million to purchase an issue of voting preferred stock of Farmers Bank of State of Delaware.

William C. Bradley, Jr.